## YOUNG ET AL. *v.* FORDICE ET AL.

No. 95–2031.   Argued January 6, 1997—Decided March 31, 1997

274

*Brenda Wright* argued the cause for appellants.   With her on the briefs were *Barbara R. Arnwine, Thomas J. Henderson, Samuel L. Walters, A. Spencer Gilbert III, Laughlin McDonald,* and *Neil Bradley.*

*Malcolm L. Stewart* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Acting Solicitor General Dellinger, Assistant Attorney General Patrick, Deputy Solicitor General Waxman,* and *Steven H. Rosenbaum.*

*Robert E. Sanders,* Assistant Attorney General of Mississippi, argued the cause for appellees. · With him on the brief was *Mike Moore,* Attorney General.*

JUSTICE BREYER delivered the opinion of the Court.

The question before us is whether §5 of the Voting Rights Act of 1965, 79 Stat. 439, as amended, 42 U. S. C. § 1973c (§5), requires preclearance of certain changes that Mississippi made in its voter registration procedures—changes that Mississippi made in order to comply with the National Voter Registration Act of 1993. We hold that §5 does require preclearance.

I

A

*The National Voter Registration Act*

Congress enacted the National Voter Registration Act of 1993 (NVRA), 107 Stat. 77, 42 U. S. C. § 1973gg *et seq.,* to take effect for States like Mississippi on January 1, 1995. The NVRA requires States to provide simplified systems for registering to vote in *federal* elections, *i. e.,* elections for federal officials, such as the President, congressional Representatives, and United States Senators. The States must provide a system for voter registration by mail, § 1973gg–4, a system for voter registration at various state offices (including those that provide "public assistance" and those that provide services to people with disabilities), § 1973gg–5, and, particularly important, a system for voter registration on a driver's license application, § 1973gg–3. The NVRA speci-

---

*\*Juan Cartagena* filed a brief for the Community Service Society of New York et al. as *amici curiae* urging reversal.

fies various details about how these systems must work, including, for example, the type of information that States can require on a voter registration form. §§ 1973gg–3(c)(2), 1973gg–7(b). It also imposes requirements about just when, and how, States may remove people from the federal voter rolls. §§ 1973gg–6(a)(3), (4). The NVRA adds that it does not "supersede, restrict or limit the application of the Voting Rights Act of 1965," and that it does not "authoriz[e] or requir[e] conduct that is prohibited by the Voting Rights Act of 1965." § 1973gg–9(d).

## The Voting Rights Act

Section 5 of the Voting Rights Act of 1965 (VRA), among other things, prohibits a State with a specified history of voting discrimination, such as Mississippi, from "enact[ing] or seek[ing] to administer any . . . practic[e], or procedure with respect to voting different from that in force or effect on November 1, 1964," unless and until the State obtains preclearance from the United States Attorney General (Attorney General) or the United States District Court for the District of Columbia. § 1973c. Preclearance is, in effect, a determination that the change "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color." *Ibid.* In the language of § 5 jurisprudence, this determination involves a determination that the change is not retrogressive. *Beer* v. *United States*, 425 U. S. 130, 141 (1976); 28 CFR § 51.54(a) (1996).

### B

The case before us concerns three different Mississippi voting registration systems: The first system, which we shall call the "Old System," is that used by Mississippi before it tried to comply with the NVRA. The second system, the "Provisional Plan," is a system aimed at NVRA compliance, which Mississippi tried to implement for about six weeks between January 1, 1995, and February 10, 1995. The third

system, the "New System," is the system that Mississippi put into place after February 10, 1995, in a further effort to comply with the NVRA. We shall briefly explain the relevant features of each system.

*The Old System.* Before 1995, Mississippi administered a voting registration system, which, like the systems of most States, provided for a single registration that allowed the registrant to vote in both federal elections and state elections (*i. e.*, elections for state and local offices). Under Mississippi law, a citizen could register to vote either by appearing personally at a county or municipal clerk's office or at other locations (such as polling places) that the clerk or his deputy visited to register people to vote. Miss. Code Ann. §§ 23–15–35, 23–15–37, 23–15–39(6) (1990). Mississippi citizens could also register by obtaining a mail-in registration form available at driver's license agencies, public schools, and public libraries, among other places, and mailing it back to the clerk. Miss. Code Ann. § 23–15–47(2)(a) (Supp. 1996). The law set forth various details, requiring, for example, that a mail-in application contain the name and address of the voter and that it be attested to by a witness, *ibid.* (although there is some dispute between the parties about whether an application could be rejected for failing to have the witness' signature). State law also allowed county registration officials to purge voters from the rolls if they had not voted in four years. Miss. Code Ann. § 23–15–159 (1990).

*The Provisional Plan.* In late 1994, the Mississippi secretary of state, with the help of an NVRA implementation committee, prepared a series of voter registration changes designed to ensure compliance with the NVRA. The new voter registration application that was incorporated into the driver's license form, for example, did not require that the registrant repeat his or her address, nor did it require an attesting witness. The secretary of state provided information and instructions about those changes to voter registration officials and state agency personnel throughout the

State. The secretary of state and the implementing committee assumed—and recommended—that the Mississippi Legislature would change state law insofar as that law might prevent a valid registration under the NVRA's provisions from counting as a valid registration for a state or local election. And, on that assumption, at least one official in the secretary of state's office told state election officials to place the name of any new valid applicant under the NVRA on a list that would permit him or her to vote in state, as well as in federal, elections.

Using this Provisional Plan, at least some Mississippi officials registered as many as 4,000 voters between January 1, 1995, and February 10, 1995. On January 25, however, the state legislature tabled a bill that would have made NVRA registrations valid for all elections in Mississippi (by, for example, allowing applicants at driver's license and other agencies to register on the spot, without having to mail in the application themselves, App. 86, by eliminating the attesting witness signature on the mail-in application, compare. id., at 96, 101, with Miss. Code Ann. § 23–15–47(3) (Supp. 1996), and by eliminating the optional 4-year purge of nonvoting registrants, replacing it with other methods for maintaining up-to-date voter rolls, App. 87–92, 103). Because of the legislature's failure to change the Old System's requirements for state election registration, the state attorney general concluded that Provisional Plan registrations that did not meet Old System requirements would *not* work, under state law, as registration for state elections. State officials notified voter registration officials throughout the State; and they, in turn, were asked to help notify the 4,000 registrants that they were not registered to vote in state or local elections.

*The New System.* On February 10, 1995, Mississippi began to use what we shall call the New System. That system consists of the changes that its Provisional Plan set forth—but as applied only to registration for federal elections. Mississippi maintains the Old System as the only

method for registration for state elections, and as one set of methods to register for federal elections. See App. to Juris. Statement 21a. All other States, we are told, have modified their voter registration rules so that NVRA registration registers voters for both federal and state elections. Brief for United States as *Amicus Curiae* 4.

## C

This case arises out of efforts by Mississippi to preclear, under §5 of the VRA, changes that it made to comply with the NVRA. In December 1994, Mississippi submitted to the United States Attorney General a list of NVRA-implementing changes that it then intended to make. That submission essentially described what we have called the Provisional Plan. The submission contained numerous administrative changes described in two booklets called The National Voter Registration Act, App. 26–43, and the Mississippi Agency Voter Registration Procedures Manual, *id.*, at 51–60. It also included the proposed state legislation necessary to make the Provisional Plan work for state elections as well. *Id.*, at 86–104. Mississippi requested preclearance. *Id.*, at 109–110. On February 1, 1995, the Department of Justice wrote to Mississippi that the Attorney General did "not interpose any objection to the specified changes"—thereby preclearing Mississippi's submitted changes. App. to Juris. Statement 17a.

As we pointed out above, however, on January 25, about one week before the Attorney General precleared the proposed changes, the state legislature had tabled the proposed legislation needed to make those changes effective for state elections. On February 10, 10 days after the Department precleared the proposed changes, Mississippi officials wrote to voter registration officials around the State, telling them that it "appears unlikely that the Legislature will" revive the tabled bill; that the Provisional Plan's registration would therefore not work for state elections; that they should

write—or help the secretary of state write—to tell those who had registered under that system that they were not registered to vote in state elections; that they should make certain future registrants understand that they would need to register separately to be eligible to vote in state, as well as federal, elections; and that they should develop a system for distinguishing between NVRA and other voters. *Id.*, at 20a–23a.

On February 16, about two weeks after the Department of Justice sent its preclearance letter, the Department wrote another letter to Mississippi, which made clear that the Department did not believe its earlier preclearance had precleared what it now saw as a new plan. The Department asked the State to submit what it called this new "dual registration and voter purge system" for preclearance. *Id.*, at 24a. The Department added:

> "In this regard, we note that while, on February 1, 1995, the Attorney General granted Section 5 preclearance to procedures instituted by the state to implement the NVRA, that submission did not seek preclearance for a dual registration and purge system and, indeed, we understand that the decision to institute such a system was not made until after February 1." *Id.*, at 24a–25a.

Mississippi, perhaps believing that the February 1 preclearance sufficed, made no further preclearance submissions.

## D

On April 20, 1995, four private citizens (appellants) brought this lawsuit before a three-judge District Court. They claimed that Mississippi and its officials had implemented changes in its registration system without preclearance in violation of § 5. The United States, which is an *amicus curiae* here, brought a similar lawsuit, and the two actions were consolidated.

The three-judge District Court granted Mississippi's motion for summary judgment. It considered the plaintiffs'

basic claim, namely, that the differences between the *Provisional Plan* and the New System amounted to a change in the administration of Mississippi's voting registration practice, which change had not been precleared. The court rejected this argument on the ground that the Provisional Plan was a misapplication of state law, never ratified by the State. Since the differences between the New System and the Provisional Plan were attributable to the State's attempt to correct this misapplication of state law, the court held, those differences were not changes subject to preclearance.

The court also considered a different question, namely, whether the New System differed from the *Old System;* and whether Mississippi had precleared all the changes that the New System made in the Old. The court held that the Department had (on February 1) precleared the administrative changes needed to implement the NVRA. The court also held that Mississippi did not need to preclear its failure to pass a law that would have permitted NVRA registration to count for state, as well as for federal, elections, as the distinction between state and federal elections was due to the NVRA's own provisions, not to the State's changes in voting practices.

The private plaintiffs appealed, and we noted probable jurisdiction. 518 U. S. 1055 (1996). We now reverse.

## II

Section 5 of the VRA requires Mississippi to preclear "any . . . practic[e] or procedure with respect to voting different from that in force or effect on November 1, 1964." 42 U. S. C. § 1973c. The statute's date of November 1, 1964, often, as here, is not directly relevant, for differences once precleared normally need not be cleared again. They become part of the baseline standard for purposes of determining whether a State has "enact[ed]" or is "seek[ing] to administer" a "practice or procedure" that is "different" enough itself to require preclearance. *Presley* v. *Etowah County*

*Comm'n*, 502 U. S. 491, 495 (1992) ("To determine whether there have been changes with respect to voting, we must compare the challenged practices with those in existence before they were adopted. Absent relevant intervening changes, the Act requires us to use practices in existence on November 1, 1964, as our standard of comparison"). Regardless, none of the parties asks us to look further back in time than 1994, when the Old System was last in effect. The appellants ask us to consider whether Mississippi's New System amounts to a forbidden effort to implement uncleared changes either (a) because the New System is "different from" the post-1994 Provisional Plan or (b) because it is "different from" the 1994 Old System. We shall consider each of these claims in turn.

## A

First, the appellants and the Government argue that the Provisional Plan, because it was precleared by the Attorney General, became part of the baseline against which to judge whether a future change must be precleared. They add that the New System differs significantly from the Provisional Plan, particularly in its effect on registration for state elections. They conclude that Mississippi had to preclear the New System insofar as it differed from the Provisional Plan.

The District Court rejected this argument on the ground that the Provisional Plan practices and procedures never became part of Mississippi's voting-related practices or procedures, but instead simply amounted to a temporary misapplication of state law. We, too, believe that the Provisional Plan, in the statute's words, was never "in force or effect." 42 U. S. C. § 1973c.

The District Court rested its conclusion upon the fact that Mississippi did not change its state law so as to make the Provisional Plan's "unitary" registration system lawful and that neither the Governor nor the legislature nor the state attorney general ratified the Provisional Plan. The appel-

lants argue that the simple fact that a voting practice is unlawful under state law does not show, entirely by itself, that the practice was never "in force or effect." We agree. A State, after all, might maintain in effect for many years a plan that technically, or in one respect or another, violated some provision of state law. Cf. *Perkins v. Matthews*, 400 U. S. 379, 394–395 (1971) (deeming ward system "*in fact* 'in force or effect'" and requiring change from wards to at-large elections to be precleared even though ward system was illegal and at-large elections were required under state law (emphasis in original)); *City of Lockhart v. United States*, 460 U. S. 125, 132–133 (1983) (numbered-post election system was "in effect" although it may have been unauthorized by state law). But that is not the situation here.

In this case, those seeking to administer the Provisional Plan did not intend to administer an unlawful plan. They expected it to become lawful. They abandoned the Provisional Plan as soon as its unlawfulness became apparent, *i. e.*, as soon as it became clear that the legislature would not pass the laws needed to make it lawful. Moreover, all these events took place within the space of a few weeks. The plan was used to register voters for only 41 days, and only about a third of the State's voter registration officials had begun to use it. Further, the State held no elections prior to its abandonment of the Provisional Plan, nor were any elections imminent. These circumstances taken together lead us to conclude that the Provisional Plan was not "in force or effect"; hence it did not become part of the baseline against which we are to judge whether future change occurred.

B

We nonetheless agree with the appellants and the Government that the New System included changes that must be, but have not been, precleared. That is because the New System contains "practices and procedures" that are significantly "different from" the Old System—the system that was

in effect in 1994. And the State has not precleared those differences.

This Court has made clear that minor, as well as major, changes require preclearance. *Allen* v. *State Bd. of Elections*, 393 U. S. 544, 566–569 (1969) (discussing minor changes, including a change from paper ballots to voting machines); *NAACP* v. *Hampton County Election Comm'n*, 470 U. S. 166, 175–177 (1985) (election date relative to filing deadline); *Perkins, supra*, at 387 (location of polling places). See also 28 CFR § 51.12 (1996) (requiring preclearance of "[a]ny change affecting voting, even though it appears to be minor or indirect . . ."). This is true even where, as here, the changes are made in an effort to comply with federal law, so long as those changes reflect policy choices made by state or local officials. *Allen, supra*, at 565, n. 29 (requiring State to preclear changes made in an effort to comply with § 2 of the VRA, 42 U. S. C. § 1973); *McDaniel* v. *Sanchez*, 452 U. S. 130, 153 (1981) (requiring preclearance of voting changes submitted to a federal court because the VRA "requires that whenever a covered jurisdiction submits a proposal reflecting the policy choices of the elected representatives of the people— no matter what constraints have limited the choices available to them—the preclearance requirement of the Voting Rights Act is applicable"); *Lopez* v. *Monterey County*, 519 U. S. 9, 22 (1996) (quoting *McDaniel* and emphasizing the need to preclear changes reflecting policy choices); *Hampton County Election Comm'n, supra*, at 179–180 (requiring preclearance of change in election date although change was made in an effort to comply with § 5). Moreover, the NVRA does not forbid application of the VRA's requirements. To the contrary, it says "[n]othing in this subchapter authorizes or requires conduct that is prohibited by the" VRA. 42 U. S. C. § 1973gg–9(d)(2). And it adds that "neither the rights and remedies established by this section nor any other provision of this subchapter shall supersede, restrict, or limit the application of the" VRA. § 1973gg–9(d)(1).

Nor does it matter for the preclearance requirement whether the change works in favor of, works against, or is neutral in its impact upon the ability of minorities to vote. See generally *City of Lockhart* v. *United States, supra* (requiring preclearance of a change but finding the change nonretrogressive). It is change that invokes the preclearance *process;* evaluation of that change concerns the *merits* of whether the change should in fact be precleared. See *Lopez, supra,* at 22–25; *Allen, supra,* at 555, n. 19, 558–559. That is so because preclearance is a process aimed at preserving the status quo until the Attorney General or the courts have an opportunity to evaluate a proposed change. See *McCain* v. *Lybrand,* 465 U. S. 236, 243–244 (1984) (Without § 5, even successful antidiscrimination lawsuits might "merely resul[t] in a change in methods of discrimination"); *South Carolina* v. *Katzenbach,* 383 U. S. 301, 335 (1966) (same); *id.,* at 328 (explaining how the VRA could attack the problems of States going from one discriminatory system to another, by shifting "the advantage of time and inertia" to the potential victims of that discrimination).

In this case, the New System contains numerous examples of new, significantly different administrative practices—practices that are not purely ministerial, but reflect the exercise of policy choice and discretion by Mississippi officials. The system, for example, involves newly revised written materials containing significant, and significantly different, registration instructions; new reporting requirements for local elections officials; new and detailed instructions about what kind of assistance state agency personnel should offer potential NVRA registrants, which state agencies will be NVRA registration agencies, and how and in what form registration material is to be forwarded to those who maintain the voting rolls; and other similar matters. Insofar as they embody discretionary decisions that have a potential for discriminatory impact, they are appropriate matters for review under § 5's preclearance process.

In saying this, we recognize that the NVRA imposes certain mandates on States, describing those mandates in detail. The NVRA says, for example, that the state driver's license applications must also serve as voter registration applications and that a decision not to register will remain confidential. 42 U. S. C. §§ 1973gg–3(a)(1), (c)(2)(D)(ii). It says that States cannot force driver's license applications to submit the same information twice (on license applications and again on registration forms). § 1973gg–3(c)(2)(A). Nonetheless, implementation of the NVRA is not purely ministerial. The NVRA still leaves room for policy choice. The NVRA does not list, for example, all the other information the State may—or may not—provide or request. And a decision about that other information—say, whether or not to tell the applicant that registration counts only for federal elections—makes Mississippi's changes to the New System the kind of discretionary, nonministerial changes that call for federal VRA review. Hence, Mississippi must preclear those changes.

## C

We shall consider Mississippi's two important arguments to the contrary.

### 1

The first set of arguments concerns the effect of the Attorney General's preclearance letter. Mississippi points out that the Department of Justice wrote to the State on February 1, 1995, that the Attorney General did "not interpose any objection" to its NVRA changes. App. to Juris. Statement 17a. Hence, says Mississippi, the Attorney General has already precleared its efforts to comply.

The submission that the Attorney General approved, however, assumed that Mississippi's administrative changes would permit NVRA registrants to vote in both state and federal elections. The submission included a pamphlet entitled The National Voter Registration Act, App. 26–43, which

set forth what Mississippi's submission letter called the State's "plan to administratively implement NVRA on January 1, 1995," *id.*, at 110. The submission included legislative changes; indeed, Mississippi enclosed in the packet the proposed legislation that would have made a single NVRA registration valid for both federal and state elections. *Id.*, at 86–104. The submission also included forms to be provided NVRA registrants, forms that, by their lack of specificity, probably would have led those voters—and the Attorney General—to believe that NVRA registration permitted them to vote in all elections. *Id.*, at 44–50. These forms—perfectly understandable on the "single registration" assumption—might well mislead if they cannot in fact be used to register for state elections. Cf. *City of Lockhart* v. *United States*, 460 U. S., at 131–132 (requiring city to submit "entire system" because "[t]he possible discriminatory purpose or effect of the [changes], admittedly subject to § 5, cannot be determined in isolation from the 'pre-existing' elements"). Furthermore, the submission included no instructions to voter registration officials about treating NVRA registrants differently from other voters and provided for no notice to NVRA registrants that they could not vote in state elections.

Mississippi replies that, as a matter of logic, one could read its submission, with its explicit indication that the state legislation was proposed, but not yet enacted, as a request for approval of the administrative changes *whether or not the state legislature passed the bill.* It tries to derive further support for its claim by pointing to Department of Justice regulations that say that the Attorney General will not preclear unenacted legislation. 28 CFR §§ 51.22, 51.35 (1996). As a matter of pure logic, Mississippi is correct. One could logically understand the preclearance in the way the State suggests. But still, that is not the *only* way to understand it. At a minimum, its submission was ambiguous as to whether (1) it sought approval on the assumption that the

state legislature would enact the bill, or (2) it sought approval whether or not the state legislature would enact the bill. Although there is one reference to the possibility of a "dual registration system" in the absence of legislation, App. 72, the submission simply did not specify what would happen if the legislature did not pass the bill, and it thereby created ambiguity about whether the practices and procedures described in the submission would be implemented regardless of what the legislature did. The VRA permits the Attorney General to resolve such ambiguities against the submitting State. *McCain*, 465 U. S., at 249, 255–257 (burden is on the State to submit a complete and unambiguous description of proposed changes); *Clark* v. *Roemer*, 500 U. S. 646, 658–659 (1991) (relying on "presumption that any ambiguity in the scope of the preclearance request must be construed against the [State]" (internal quotation marks and citations omitted)). See also 28 CFR §§ 51.26(d), 51.27(c) (1996) (requiring preclearance submissions to explain changes clearly and in detail). Hence, the Attorney General could read her approval of the submitted plan as an approval of a plan that rested on the assumption that the proposed changes would be valid for all elections, not a plan in which NVRA registration does not qualify the registrant to vote in state elections. We find nothing in the Attorney General's regulations that forces a contrary conclusion.

Mississippi adds that the Attorney General—if faced with an ambiguity—could have sought more information to clarify the situation, to determine what would happen if the legislature failed to pass the bill, for example. And the Attorney General could then have withheld her approval once she found out what would likely occur. Again, Mississippi is right as to what the Attorney General *might* have done. See § 51.37(a) (Attorney General may request more information about submissions). Indeed, the United States "acknowledge[s]" that with "the benefit of hindsight, . . . such a request might have been preferable" to preclearing the sub-

mission. Brief for United States as *Amicus Curiae* 27, n. 14. Still, the law does not *require* the Attorney General, in these circumstances, to obtain more information. *Clark, supra,* at 658–659 (The Attorney General is under no duty to investigate voting changes). See also *McCain, supra,* at 247 (Congress " 'acknowledged and anticipated [the] inability of the Justice Department—given limited resources—to investigate independently all changes . . .' " (quoting *Perkins,* 400 U. S., at 392, n. 10)). And the issue, of course, is not whether she should or should not have issued a preclearance letter on February 1, 1995, but rather *what it was* that she precleared. Her failure to seek added information makes it more likely, not less likely, that she intended to preclear what she took to be the natural import of the earlier submission, namely, a proposal for a single state/federal registration system.

Finally, Mississippi argues that the Attorney General *in fact* knew, on February 1, 1995, when she issued the preclearance letter that the state legislature would not enact the proposed bill. And it adds that the Attorney General nonetheless approved the submission in order to have in place a precleared unitary system that would serve as a benchmark for measuring whether subsequent changes are retrogressive, thereby permitting the Attorney General to argue that § 5 prohibited as retrogressive the dual system which she knew would likely emerge because the legislation failed. In fact, the record is not clear about just what the Department of Justice did or did not know (*e. g.,* whether tabling the bill meant killing it; whether state election law definitely had to be changed). But in any event, the short answer to the argument is that Mississippi's description of the Department's motive, if true, would refute its claim that the Attorney General intended to preclear a dual system. Indeed, only two weeks after the February 1 preclearance, the Attorney General wrote to Mississippi stating explicitly her view that its submission had not sought "preclearance for a

dual registration and purge system." App. to Juris. Statement 25a. See *McCain, supra,* at 255–256 (relying on "such after-the-fact Justice Department statements . . . in determining whether a particular change was actually precleared").

Regardless, the law ordinarily permits the Attorney General to rest a decision to preclear or not to preclear upon the submission itself. *Clark, supra,* at 658–659; *United States v. Sheffield Bd. of Comm'rs,* 435 U. S. 110, 136–138 (1978). Tying preclearance to a particular set of written documents themselves helps to avoid the kinds of arguments about meaning and intent that Mississippi raises here—arguments that, were they frequently to arise, could delay expeditious decisionmaking as to the many thousands of requests for clearance that the Department of Justice receives each year. See *Clark, supra,* at 658–659. In sum, we conclude that the Department of Justice, on February 1, did not preclear the New System.

2

Finally, Mississippi argues that the NVRA, because it specifically applies only to registration for federal elections, 42 U. S. C. § 1973gg–2(a), automatically authorizes it to maintain separate voting procedures; hence § 5 cannot be used to force it to implement the NVRA for all elections. If Mississippi means that the NVRA does not forbid two systems and that § 5 of the VRA does not categorically—*without more*—forbid a State to maintain a dual system, we agree. The decision to adopt the NVRA federal registration system is not, by itself, a change for the purposes of § 5, for the State has no choice but to do so. And of course, a State's retention of a prior system for state elections, by itself, is not a change. It is the discretionary elements of the new federal system that the State must preclear. The problem for Mississippi is that preclearance typically requires examination of discretionary changes in context—a context that includes history, purpose, and practical effect. See *City of Lockhart* v.

*United States*, 460 U. S., at 131 ("The possible discriminatory purpose or effect of the [changes], admittedly subject to § 5, cannot be determined in isolation from the 'pre-existing' elements of the council"). The appellants and the Government argue that *in context* and in light of their practical effects, the particular changes and the way in which Mississippi administers them *could* have the "purpose [or] effect of denying or abridging the right to vote on account of race or color . . . ." 42 U. S. C. § 1973c. We cannot say whether or not that is so, for that is an argument about the merits. The question here is "preclearance," and preclearance is necessary so that the appellants and the Government will have the opportunity to find out if it is true.

## III

We hold that Mississippi has not precleared, and must preclear, the "practices and procedures" that it sought to administer on and after February 10, 1995. The decision of the District Court is reversed, and the case is remanded with instructions for the District Court to enter an order enjoining further use of Mississippi's unprecleared changes as appropriate. Any further questions about the remedy for Mississippi's use of an unprecleared plan are for the District Court to address in the first instance. *Clark*, 500 U. S., at 659–660.

*It is so ordered.*