Lawrence A. **WARDEN**, Robert Jackson, Raisa Castillo, Edwin Peters, Robert Lizardo, Louisa Chan, Venice Anglero, Martha Espinal, individually and pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs,

v.

George **PATAKI**, as Governor of the State of New York, et al., Defendants.

No. 97 Civ. 7027(MBM).

United States District Court, S.D. New York.

July 23, 1998.

Edward Wolf, New York, NY, for plaintiffs.

Michael Hess, Corporation Counsel of the City of New York, Andrew Jones, Jeffrey Friedlander, Georgia Pestana, Assistant Corporation Counsel, New York, NY, for Municipal Defendants.

BEFORE: KEARSE, Circuit Judge, and BLOCK and MUKASEY, District Judges.[1]

## OPINION AND ORDER

MUKASEY, District Judge.

Plaintiffs in this case have launched a broad frontal attack on the current system of governance for New York City's public schools, alleging that the manner of selecting members of the central Board of Education (the "Board"), and the allocation of power between the Board and community school boards, violate numerous statutes and constitutional provisions. However, this opinion concerns only one prong of that attack: the claim that the current method for selecting members of the Board violates the Voting Rights Act of 1965 (the "Act"), 42 U.S.C. § 1971 *et seq.*, because it was not approved by the District Court for the District of Columbia or by the United States Attorney General before being implemented. The defendants immediately involved in the governance of the New York City schools—including the Mayor, the Chancellor of the New York City School District, members of the Board, and the Special Commissioner of Investigation for the New York City School District (collectively, the "Municipal Defendants")—have moved for a summary judgment dismissing that claim. As explained

---

**1.** The Hon. Amalya L. Kearse, United States Circuit Judge for the Second Circuit; the Hon. Frederic Block, United States District Judge for the Eastern District of New York; the Hon. Michael B. Mukasey, United States District Judge for the Southern District of New York.

more fully below, that motion was referred for decision to a three-judge court appointed pursuant to 28 U.S.C. § 2284. For the reasons set forth below, the motion is granted.

### I.

Under § 5 of the Act, 42 U.S.C. § 1973c (1994), a state or political subdivision that is covered by the Act may not "enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964" without obtaining either a declaration by the District Court for the District of Columbia that such change does not have the purpose or effect of "denying or abridging the right to vote on account of race or color," or preclearance for the change from the Attorney General. Any change implemented without obtaining either such a declaratory judgment or preclearance is unenforceable. See Hathorn v. Lovorn, 457 U.S. 255, 269, 102 S.Ct. 2421, 72 L.Ed.2d 824 (1982). The parties do not dispute that the New York City counties of Kings, New York and the Bronx, are covered by the Act.

The statute has been read to cover at least four categories of changes that may not be made without authorization: (1) changes in the manner of voting; (2) changes in candidacy qualifications and requirements; (3) changes in the composition of the electorate; and (4) creation or abolition of an elective office. See Presley v. Etowah County Comm'n, 502 U.S. 491, 502–03, 112 S.Ct. 820, 117 L.Ed.2d 51 (1992). In this case, plaintiffs claim that the current method of selecting the seven members of the Board, in which two are appointed by the Mayor and one is appointed by each of the City's five borough presidents, came about as the result of a change from an elective to an appointive system, and therefore falls within the fourth

category and thus is a "practice[ ] or procedure with respect to voting different from that in force or effect on November 1, 1964," within the meaning of § 5 of the Act.

As noted, the statute directs that any action thereunder be heard by a court of three judges appointed pursuant to 28 U.S.C. § 2284,[2] and such a court was duly appointed by the Chief Judge of this Circuit by order dated October 23, 1997. The duty of the three-judge court is to determine whether a change covered by the statute has been made without proper authorization. See Perkins v. Matthews, 400 U.S. 379, 383–84, 91 S.Ct. 431, 27 L.Ed.2d 476 (1971); Allen v. State Bd. of Elections, 393 U.S. 544, 558–59, 561, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969).

### II.

The relevant history of how members of the Board have been selected is as follows. In 1961, the Board members were appointed by the Mayor of New York City from among persons recommended by a selection committee. See N.Y. Educ. Law § 2553(2) (1961), as amended by N.Y.Laws 1961, ch. 971, § 3. Pursuant to Chapter 330 of the Laws of 1969 ("Chapter 330"), the New York State Legislature created community school boards in New York City, and provided for a seven-member central Board, two of whom were to be appointed by the Mayor and the other five of whom were to be elected, one from each of the City's boroughs or counties. See McKinney's 1969 Session Laws of New York, Vol. 1, ch. 330, § 4, at 428. The provisions of Chapter 330 creating the elective board were not to become effective until February 16, 1970, see id. § 13, at 457–58, with the first election scheduled for May 1970. See id. § 4, at 428. That chapter provided also for an interim Board of five members, one appointed by each of the borough presidents, to serve until the election could be held and the elected

---

**2.** Section 2284 provides in relevant part as follows:

(b) In any action required to be heard and determined by a district court of three judges under ... this section, the composition and procedure of the court shall be as follows:

(1) Upon the filing of a request for three judges, the judge to whom the request is presented shall, unless he determines that

three judges are not required, immediately notify the chief judge of the circuit, who shall designate two other judges, at least one of whom shall be a circuit judge. The judges so designated, and the judge to whom the request was presented, shall serve as members of the court to hear and determine the action or proceeding.

members take up their duties. *See id.* § 11, at 457.

However, on November 20, 1969, Chapter 330 was struck down as a violation of the "'one man, one vote' principle" of *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), and *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). *Oliver v. Bd. of Education of City of New York,* 306 F.Supp. 1286, 1288–89 (S.D.N.Y. 1969). However, *Oliver* upheld the composition of the interim appointed Board. *Id.* at 1289. To fill the gap created by the nullification of the elective mechanism set forth in Chapter 330, which did not survive even to its projected effective date, the Legislature immediately extended for one year the interim appointive arrangement set forth in the statute and upheld in *Oliver. See* McKinney's 1970 Session Laws of New York, Vol. 1, ch. 3, § 2, at 3–4. The Legislature then extended the arrangement for another year, *see* McKinney's 1971 Session Laws of New York, Vol. 1, ch. 6, § 1, at 9, and finally, in 1972, extended it for yet another two years. *See* McKinney's 1972 Session Laws of New York, Vol. 1, ch. 29, § 2, at 155.

The current Board structure came into being when the statute challenged in this case was enacted in 1973. That statute created a seven-member Board, with two members appointed by the Mayor and one by each of the five borough presidents. *See* McKinney's 1973 Session Laws of New York, Vol. 2, ch. 915, § 1, at 1714.

As is apparent from the above history, there was never an elected Board during the relevant period; again, the provision in Chapter 330 creating such a Board did not survive even until its projected effective date of February 16, 1970.

### III.

The question before this court is whether, in view of that history, the current appointive system of electing Board members is a "practice[ ] or procedure with respect to voting

different from that in effect on November 1, 1964," within the meaning of § 5 of the Act, a change that would be unenforceable without the authorization required by the Act.[3] In this case, presenting the foregoing legal and factual background for that controlling question is more arduous than determining the answer, which requires analysis of only one case.

That case is *Young v. Fordice,* 520 U.S. 273, 117 S.Ct. 1228, 137 L.Ed.2d 448 (1997), where the Court considered whether there had been a change in Mississippi's voter registration system that required authorization before it could be implemented. The Court had to determine which of two prior systems it should use as the benchmark against which to measure the challenged system for the purpose of determining whether there had been such a change. Before 1995, Mississippi had used what was referred to as the "Old System." *Id.,* 117 S.Ct. at 1232. In 1995, Mississippi started to put into effect a plan (the "Provisional Plan") that had been drafted in order to comply with the requirements of the National Voter Registration Act of 1993, 42 U.S.C. § 1973gg *et seq.,* even though the Provisional Plan had not yet actually been passed by the legislature. *Young,* 117 S.Ct. at 1233. The Provisional Plan was precleared by the Attorney General, and for a few weeks voters were actually registered under the Provisional Plan. *Id.* However, the legislature soon tabled the Provisional Plan and did not pass it. *Id.* Instead, the legislature passed what was referred to as the "New System" for registering voters, which was then challenged under the Act as a change that lacked proper authorization. *Id.* at 1233–34.

The pertinent issue in *Young* was whether to use the Old System or the Provisional Plan as the benchmark against which to measure whether the New System wrought a change that required authorization under the Act. *Id.* at 1235. Even though the Provisional Plan had been precleared, and had been used to register voters for a brief period, the Court held that it had never actually gone

---

**3.** The date referred to in § 5, November 1, 1964, may not always be relevant, for previously approved changes normally need not be cleared again. *See Young v. Fordice,* 520 U.S. 273, 117 S.Ct. 1228, 1234, 137 L.Ed.2d 448 (1997). Such

changes become part of the baseline standard for purposes of determining whether a jurisdiction is enacting or seeking to administer a different practice or procedure with respect to voting. *See id.; Presley,* 502 U.S. at 495, 112 S.Ct. 820.

into effect, and therefore could not provide the standard against which to measure the New System:

> In this case, those seeking to administer the Provisional Plan .... abandoned the Plan as soon as its unlawfulness became apparent, *i.e.*, as soon as it became clear that the legislature would not pass the laws needed to make it lawful. Moreover, all these events took place within the space of a few weeks. The plan was used to register voters for only 41 days, and only about a third of the State's voter registration officials had begun to use it. Further, the State held no elections prior to its abandonment of the Provisional Plan, nor were any elections imminent. These circumstances taken together lead us to conclude that the Provisional Plan was not "in force or effect"; hence it did not become part of the baseline against which we are to judge whether future change occurred.

*Id.* at 1235.

The result here follows from the result in *Young.* Here, the elective system that was to be established by Chapter 330 was invalidated in *Oliver* even before its effective date, and there is no claim that any steps were taken to carry it into effect. Certainly, no elections were held before it was invalidated. Therefore, like the Provisional Plan in *Young,* the elective system for Board members that was to be established by Chapter 330 was never in force or effect, and plaintiffs cannot successfully argue that it should provide the benchmark against which to measure the current appointive system. Rather, the earlier interim appointive system provides that benchmark. However, by definition, a change from one appointive system to another is not a change in a "practice[ ] or procedure with respect to voting" under § 5 of the Act, and therefore cannot be challenged under that statute.

For the above reasons, the Municipal Defendants' motion for summary judgment dismissing plaintiffs' second claim for relief, under the Voting Rights Act, will be granted.

SO ORDERED.