Stan **DOBROVOLNY** and Steven K. **Willey,** Plaintiffs,

**Citizens for Local Option and Control Committee, Nebraska Keno Operators Association,** and **Richard Bellino,** Plaintiff–Intervenors,

v.

The State of **NEBRASKA;** Scott Moore, Secretary of State, in his official capacity and as an individual; and Margaret A. Jurgensen, Election Commissioner of Douglas County, Nebraska, individually and in her official capacity, Defendants.

No. 4:98CV3305.

United States District Court, D. Nebraska.

June 5, 2000.

Vincent M. Powers, Kathleen M. Neary, Powers Law Firm, Lincoln, NE, Denzel R. Busick, Busick Law Firm, Grand Island, NE, for plaintiffs and plaintiff-intervenors.

Dale A. Comer, L. Steven Grasz, Attorney General's Office, Lincoln, NE, Kristina B. Murphree, Christina A. Lustgarten, Timothy J. Buckley, Jennifer K. Johnson, Douglas County Attorney's Office, Civil Division, Omaha, NE, for defendants.

## MEMORANDUM AND ORDER

KOPF, District Judge.

This case is before me for decision after a bench trial. Before issuing my findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a),[1] I will briefly summarize the claims and my decision.

This action was brought by parties who unsuccessfully sought to place initiative petitions on the November 1996 general election ballot in Nebraska. They assert several claims: (1) various voter registration list maintenance provisions found in 42 U.S.C. § 1973gg–6 (1994) were violated; (2) initiative petition signature requirements in Article III, Section 2 of the Nebraska Constitution violate the First Amendment and the Due Process Clause of the Fourteenth Amendment; (3) Neb. Rev.Stat.Ann. § 32–1409 (Lexis 1996) violates the First Amendment and the Due Process Clause; and (4) they were denied access to initiative petition and voter registration records in violation of their First Amendment rights.

Defendants raise two main defenses. They assert that plaintiffs cannot bring a private cause of action under the National Voter Registration Act (NVRA), 42 U.S.C. §§ 1973gg to 1973gg–10 (1994) predicated on state ballot questions. They also assert that this court's earlier decision in *Dobrovolny v. Moore*, 936 F.Supp. 1536 (D.Neb. 1996) (hereinafter *Dobrovolny I* ), *aff'd*, 126 F.3d 1111 (8th Cir.1997), *cert. denied*, 523 U.S. 1005, 118 S.Ct. 1188, 140 L.Ed.2d 319 (1998), operates as a res judicata bar to the claims that the petition signature requirements of the Nebraska Constitution violate the First Amendment and the Due Process Clause.

Subsequent to the submission of this case, the Nebraska Supreme Court ruled that § 32–1409(1) violates the Nebraska Constitution and enjoined the Secretary of State from implementing § 32–1409(1). *State ex rel. Stenberg v. Moore*, 258 Neb. 199, 602 N.W.2d 465 (1999). This decision significantly impacts the federal constitutional claims regarding § 32–1409 and access to records.

For the reasons more fully set forth below, I have found for the defendants on all claims. First, plaintiffs and plaintiff-intervenors cannot bring a private cause of action under the NVRA predicated on state ballot questions. Second, *Dobrovolny I* presents a res judicata bar to the

---

1. Any finding of fact that is more properly construed as a conclusion of law shall be so construed. Likewise, any conclusion of law that is more properly construed as a finding of fact shall be so construed.

federal constitutional claims regarding the petition signature requirements of the Nebraska Constitution. Third, I do not decide the federal constitutional claims regarding § 32–1409 because the claim is in effect moot given the declaratory judgment and injunction entered in *State ex rel. Stenberg v. Moore.* Fourth, this court lacks jurisdiction to hear the claims of denial of access to initiative petition and voter registration records in 1996 because there is no longer a live case or controversy regarding the access claim in light of the unique circumstances surrounding the November 1996 general election in Nebraska, the failure to establish any more than isolated instances of denial of access, and the holding of *State ex rel. Stenberg v. Moore.*

## I. BACKGROUND

### A. Procedural History

The plaintiffs are Stan Dobrovolny and Steven Willey. The plaintiff-intervenors are Citizens for Local Option and Control Committee, Nebraska Keno Operators Association, and Richard Bellino. For convenience, I will refer to the plaintiffs and the plaintiff-intervenors collectively as "plaintiffs." For a time, plaintiffs sought to bring this action as a class action, but no class was ever certified and this is not a class action. (Order on Pretrial Conference, Filing 109 ¶ B(17).) The defendants are the State of Nebraska, Scott A. Moore (in his official capacity as Secretary of State of Nebraska and in his individual capacity), and Margaret A. Jurgensen (in her official capacity as Douglas County Election Commissioner and in her individual capacity).

There are two complaints in this case: the Third Amended Complaint filed by

plaintiffs Dobrovolny and Willey (filing 29) (the "Dobrovolny Complaint") and the Complaint in Intervention filed by plaintiff-intervenors Richard Bellino, Nebraska Keno Operators Association, and Citizens for Local Option and Control Committee (filing 31) (the "Intervenors' Complaint").

In September 1996, a three-day hearing was held before me on motions for a preliminary injunction and sanctions. At the conclusion of that hearing, I found that I had subject matter jurisdiction, but abstained to permit the Lancaster County District Court to decide a case then pending before it. It appeared that the state court would decide state law in a way that would obviate the need for this court to decide difficult federal constitutional questions regarding state law. (Filing 36.)

While the case before me was stayed, Judge Cheuvront, the state district judge, reached a decision on the merits in the case before him. He found that § 32–1409(1) "is unconstitutional in that it unduly restricts the initiative petition process in violation of Article III, § 4 of the Constitution of the State of Nebraska and the First Amendment of the United States Constitution." *State of Nebraska ex rel. Dobrovolny v. Moore,* Docket 547, Page 043 (Lancaster County District Court Oct. 25, 1996) at p. 7.[2] Despite the quoted language, Judge Cheuvront's opinion was rendered largely on state law grounds.

On appeal, the Nebraska Supreme Court reversed, finding that plaintiffs had simultaneously sought to enforce § 32–1409 and to challenge its constitutionality, and that parties seeking to enforce a statute were not permitted to challenge its constitutionality.[3] *State ex rel. Dobrovolny v. Moore,* 254 Neb. 392, 576 N.W.2d 772 (1998) (No. S–98–983).

**2.** I take judicial notice of Judge Cheuvront's opinion pursuant to Fed.R.Evid. 201, and will order the Clerk of the United States District Court for the District of Nebraska to file a copy of that opinion in the court file for this case.

**3.** *State ex rel. Bellino v. Moore,* was a companion case, and the Nebraska Supreme Court reached the same conclusion in that case as well, noting that the lower court's opinion was a "nullity." *State ex rel. Bellino v. Moore,* 254 Neb. 385, 390, 576 N.W.2d 793, 796 (1998).

After the Nebraska Supreme Court's decision in *State ex rel. Dobrovolny v. Moore,* the case before me was reopened. The parties filed motions for summary judgment and partial summary judgment. (Filings 75, 76, and 78). I ruled that: (1) requests for injunctive relief with respect to the November 1996 election are moot and may not be granted; (2) the State of Nebraska has Eleventh Amendment immunity on all claims for general money damages (including petition circulation costs), except to the extent that attorney fees and reasonable expenses may be awarded under the NVRA; (3) the only claim against defendants Moore and Jurgensen for general money damages was made in the Intervenors' NVRA claim, and defendants Moore and Jurgensen, in their official capacities, have Eleventh Amendment immunity on that one claim for general money damages, except to the extent that attorney fees and reasonable expenses may be awarded under the NVRA; and (4) the NVRA does not create a private right of action for money damages independent of attorneys' fees and expenses. (Filing 111.) I reserved judgment on the remaining issues raised by these motions.

A one-day bench trial was held before me on June 16, 1999, with arguments and testimony focusing on the claims that defendants had violated the NVRA.[4] The motions for summary judgment and partial summary judgment had been voluminously briefed, and the parties submitted pretrial briefs and proposed findings of fact and conclusions of law prior to the bench trial. The parties were given a lengthy period after the conclusion of the bench trial in which to file proposed findings of fact and conclusions of law indexed to the record, as well as any desired additional briefs.

### B. The Issues Before the Court

The issues in this case have evolved between the time of the 1996 hearing before me and submission of this case for decision. To the extent the Order on Final Pretrial Conference (filing 109) excludes issues raised in the Third Amended Complaint or the Intervenors' Complaint, the Order on Final Pretrial Conference governs the case. Fed.R.Civ.P. 16(e).[5] There are five groups of issues.[6]

1. *National Voter Registration Act Claims*

There are questions whether the State of Nebraska has kept and maintained a reasonably current voter registration system, including a uniform, systematic, and reasonably periodic process for maintaining the State's voter registration list, in violation of the National Voter Registration Act; whether plaintiffs are entitled to recover declaratory relief, equitable relief, or money damages; whether plaintiffs are entitled to recover attorneys' fees, litigation expenses, and costs under the NVRA; and whether the plaintiffs can bring this action as a private cause of action under

---

**4.** Citations to the transcript refer to the transcript of this June 16, 1999 trial. Citations to exhibits refer to exhibits admitted during this trial, some of which consist of testimony before me at the September 1996 hearing on the motion for preliminary injunction.

**5.** One issue raised in the Dobrovolny Complaint was not listed as a controverted issue in the Order on Final Pretrial Conference and is thus abandoned. The abandoned issue is whether the amendment to Article III, Section 2 of the Nebraska Constitution was illegally adopted in violation of the then-existing Nebraska statute requiring adequate explanations of ballot measures (Neb.Rev.Stat. § 32–707.01) and in violation of substantive and

procedural due process rights of voters. (Filing 29, ¶ 30.) In addition, although the questions (1) whether defendants Moore and Jurgensen refused to allow certain plaintiffs and their agents reasonable access to documents relating to the verification of initiative petitions in violation of this court's September 17, 1996, order and (2) whether sanctions are appropriate are identified as issues in the Order on Pretrial Conference (filing 109 ¶ C(12)), plaintiffs withdrew their motion for sanctions during the bench trial (T. at 4:15–23).

**6.** The other issues identified in the Order on Pretrial Conference are moot given my resolution of these five main issues.

the NVRA. (Filing 109, ¶¶ C(1), (3) & (5)–(7).)

### 2. Federal Constitutional Claims Regarding Petition Signature Requirements of Article III, Section 2 of the Nebraska Constitution

Both Due Process Clause and First Amendment claims are raised. The Due Process Clause issue is whether the provisions of Article III, Section 2 of the Nebraska Constitution, as interpreted by the Nebraska Supreme Court, violate the procedural due process rights of petition circulators because circulators of initiative petitions lack prior notice of the number of signatures needed to place an initiative on the ballot, entitling plaintiffs to a declaratory judgment and other relief under 42 U.S.C. §§ 1983 and 1988. (*Id.* ¶ C(8).) Two First Amendment issues are raised: (1) whether the provisions of Article III, Section 2 of the Nebraska Constitution, as interpreted by the Nebraska Supreme Court, violate the First Amendment because circulators of initiative petitions lack prior notice of the number of signatures needed to place an initiative on the ballot, entitling plaintiffs to §§ 1983 and 1988 relief, and (2) whether the provision in Article III, Section 2 of the Nebraska Constitution allowing only registered voters to sign initiative petitions violates the First Amendment and entitles plaintiffs to §§ 1983 and 1988 relief. (*Id.* ¶¶ C(8) & (9).)

### 3. Claims Regarding Constitutionality of § 32–1409

Plaintiffs have raised questions whether subparts (1) and (3) of § 32–1409 violate the First Amendment and the Due Process Clause, both on their face and as applied, entitling them to relief under §§ 1983 and 1988. (*Id.* ¶¶ C(10) & (11).) I explain these claims more fully in Part III(C) of this opinion.

### 4. Preclusion of Federal Constitutional Claims Regarding Petition Signature Requirements of Article III, Section 2 of the Nebraska Constitution

Another issue is whether the Second and Third claims for relief in the Third Amended Complaint are barred by issue or claim preclusion. (*Id.* ¶ C(16).) The Second Claim for Relief includes the assertion that lack of prior knowledge of the required number of signatures violates procedural due process. (Filing 29, ¶ 29.) The Third Claim for Relief includes two assertions: lack of prior knowledge of the required number of signatures violates the First Amendment and the Nebraska constitutional requirement that only registered Nebraska voters may sign initiative petitions violates the First Amendment rights of Nebraska citizens who have chosen not to register to vote. (Filing 29, ¶¶ 34–36.) Similar claims are made in the Intervenors' Complaint. (Filing 31.)

### 5. Claims Regarding Specific Denial of Access to Records

The Fifth Claim for Relief in the Dobrovolny Complaint alleges that in specific instances, defendants Moore and Jurgensen denied plaintiffs access to initiative petition and voter registration records needed to validate signatures, or to rebut invalidity findings of county election officials or the Secretary of State. (No similar claim for relief is made in the Intervenors' Complaint.) At the bench trial, this issue was characterized as a claim that "the state election officials unreasonably interfered with [plaintiffs'] ability to access information in their offices and thereby chilled [plaintiffs'] First Amendment right to pursue the initiative petitions." (T. at 31: 1–3.) Only injunctive and declaratory relief is sought with respect to these claims.

## II. FINDINGS OF FACT

I find the material facts to be these:

## A. General Findings

1. Plaintiff Stan Dobrovolny is a citizen, resident, registered voter, and a taxpayer of Holt County, Nebraska. Dobrovolny is president of Nebraskans' for Equal Taxation, an organization which proposed and circulated an initiative petition in 1996 to amend the Nebraska Constitution to alter Nebraska's property tax structure (hereinafter the "Property Tax Relief Initiative" or "Property Tax Relief Petition"). (Filing 109, ¶ B(1).)

2. Plaintiff Steven K. Willey is a citizen, resident, registered voter and taxpayer of Sarpy County, Nebraska. Willey is Chairman of the Citizens for Local Option and Control Committee and President of the Nebraska Keno Operators Association. (*Id.* ¶ B(2).)

3. Plaintiffs Citizens for Local Option and Control Committee and Nebraska Keno Operators Association are organizations which proposed an initiative measure in 1996 that would have permitted local communities to change Nebraska's gaming laws by majority vote (hereinafter the "Keno Initiative" or "Keno Petition"). (*Id.* ¶ B(3).)

4. Plaintiff Richard Bellino is a Nebraska registered voter and taxpayer who signed and supported the Keno Petition. (*Id.* ¶ B(4).)

5. Defendant Scott Moore is a resident of Lincoln, Lancaster County, Nebraska, and the duly elected and currently serving Secretary of State of the State of Nebraska. Moore has served as the Secretary of State since January 1995. As Secretary of State, Moore has duties specified under Nebraska statutes to interpret and enforce Nebraska's election laws. (*Id.* ¶ B(5).)

6. Defendant Margaret A. Jurgensen served as the Election Commissioner of Douglas County, Nebraska, in 1996. She was appointed by the Governor of the State of Nebraska. The Douglas County Election Commissioner has specified duties with respect to elections under the Nebraska statutes. (*Id.* ¶ B(6).) The parties have agreed that Jurgensen is a state agent for purposes of any award of attorneys' fees. (T. at 40:4–14.)

## B. NVRA Claims

7. Defendant State of Nebraska was, at all times pertinent to any issues herein, a duly admitted state of the United States of America. The State is one of the States of the United States of America affirmatively charged with the duties imposed by the NVRA. By virtue of the applicable law of Nebraska, Moore is the "chief election official" of the State of Nebraska, as that term is used in the NVRA. (Filing 109, ¶ B(7).)

8. During 1996, all of the plaintiffs participated in the circulation of initiative petitions for signature by registered voters. To get their initiative petitions on the ballot, plaintiffs were required by Nebraska law to file their initiative petitions with the Secretary of State at least four months prior to the general election in November 1996. The petitions were required to contain that number of valid signatures equaling ten (10) percent of the total number of registered voters in Nebraska (on the date those petitions were due) in order to qualify for placement on the November 1996 general election ballot. On July 3 and July 5, 1996, the petitions supporting the Property Tax Relief Initiative were filed with the Secretary of State. Records maintained by the Secretary of State show that the petitions supporting the Property Tax Relief Initiative contained 107,620 signatures. On July 5, 1996, petitions supporting the Keno Initiative were filed with the Secretary of State. Records maintained by the Secretary of State show that petitions supporting the Keno Initiative contained 133,100 signatures. (*Id.* ¶ B(9).)

9. In conformance with his duties under Neb.Rev.Stat.Ann. § 32–202 (Lexis 1999 Supp.)[7] to prepare and transmit re-

---

7. This statute was amended effective July 19, 1996, and the version in the 1999 Supplement is the version that was in effect at the relevant times in 1996.

ports as required by the NVRA, Moore, or staff members in his office acting under his supervision, compiled listings of the total number of registered voters in the State of Nebraska on a periodic basis. As a result of that process, Moore ultimately determined that there were 989,383 registered voters in the State of Nebraska on July 5, 1996. Based upon Article III, Section 2 of the Nebraska Constitution, as interpreted by the Nebraska Supreme Court in *Duggan v. Beermann*, 245 Neb. 907, 515 N.W.2d 788 (1994), and upon the applicable Nebraska statutes, Moore ultimately determined that signatures from ten percent of the registered voters in Nebraska on July 6, 1996 (98,939 signatures), were needed to place initiative measures on the November 1996 Nebraska statewide general election ballot. (Filing 109, ¶ B(10).)

10. Section 32–1409 requires the Secretary of State to deliver initiative petition signature pages filed with his office to the county election commissioners and county clerks in Nebraska so that those county election officials can conduct signature validation tests. In July, 1996, Moore sent the initiative petition signature pages filed with his office, including those filed for the Property Tax Relief Initiative and the Keno Initiative, to the county election officials in Nebraska, including defendant Jurgensen. On July 15, 1996, Moore also sent instructions for implementation of the signature validation process required by § 32–1409 to all county election officials in Nebraska, including defendant Jurgensen. Those instructions were also provided to proponents of the initiative measures which had been submitted, including the plaintiffs' organizations. (Filing 109, ¶ B(11).)

11. Nebraska county election officials returned the initiative petition signature pages to Moore in August and September 1996. (Filing 109, ¶ B(12).) When they returned the initiative petitions, county officials also completed and returned a petition log. (Ex. 131 at 9:16–21.) A "petition log" is a document submitted by the county election officials to the Secretary of State which shows the number of valid and invalid signatures and shows which particular signatures have been invalidated. (*Id.* at 9:18–11:5.) Based upon the initiative petitions and petition logs returned to him, the Secretary of State determined that, in his opinion, 87,254 of the signatures on the petitions supporting the Property Tax Relief Petition were valid. In addition, the Secretary of State determined that, in his opinion, 87,289 of the signatures on the petitions supporting the Keno Petition were valid. (Filing 109, ¶ B(12).)

12. On September 3, 1996, Moore sent representatives of the organizations promoting the Property Tax Relief Initiative and the Keno Initiative a letter, offering them an opportunity to meet with him on September 6, 1996, to provide him with additional evidence supporting the validity of the signatures on their initiative petitions. Moore held that meeting on September 6, 1996, and representatives supporting the Keno Initiative attended that meeting. (*Id.* ¶ B(13).)

13. On September 12, 1996, Moore announced his decision that neither the Property Tax Relief Initiative nor the Keno Initiative would be placed on the general election ballot based upon his determination that the petitions supporting those initiatives did not obtain sufficient signatures to meet constitutional requirements. (*Id.* ¶ B(14); Ex. 127.) On September 13, 1996, Moore certified the general election ballot pursuant to Neb.Rev.Stat.Ann. § 32–801 (Lexis 1995), and neither the Property Tax Relief Initiative nor the Keno Initiative were certified on that ballot. (Filing 109 ¶ B(14).)

14. Dobrovolny's attorney sent a letter dated July 18, 1996, to Moore. This letter claims that Nebraska was not in compliance with the NVRA at the time the letter was sent because it did not maintain a uniform, accurate, and current voter registration system. (Ex. 125; T. at 54:4–8.)

15. Moore acknowledged receipt of the July 18 letter in his capacity as Secretary of State and chief election official of the state (within the meaning of the NVRA) and treated the July 18 letter as notice of non-compliance with the NVRA. (Ex. 126; T. at 54:9–13 & 57:1–3.)

16. The NVRA was first effective in Nebraska on January 1, 1995. (Ex. 1 at 1–2.) The State of Nebraska maintains one system of voter registration for both state and federal elections, and the November 1996 Nebraska general election included election for federal offices, elections for state offices, and state initiatives. (T. at 53:6–13 & 79:14–23.)

17. The NVRA voter registration list maintenance procedures are found in § 1973gg–6 (1994). There are three key features of these provisions. First, states are required to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of registered voters" because of the death of the registrant, or a change in the residence of the registrant (if the provisions of §§ 1973gg–6(b), (c) and (d) are followed). 42 U.S.C. § 1973gg–6(a)(4). Other than removals via this general program, the name of a registered voter may be removed only if the registrant so requests or if state law requires removal for criminal conviction or mental incapacity. *Id.* § 1973gg–6(a)(3).[8] Second,

> Any State program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll for elections for Federal office—
>
> (1) shall be uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965 (42 U.S.C. § 1973 et seq.); and

(2) shall not result in the removal of the name of any person from the official list of voters registered to vote in an election for Federal office by reason of the person's failure to vote.

*Id.* § 1973gg–6(b). Third, the general program for maintaining voter registration lists must include a process for removing the names of persons who have moved. A state begins this process by mailing a notice to all persons believed to have moved. Either National Change of Address (NCOA) information from the post office, or the results of a mass mailing to all registered voters, can serve to identify persons believed to have moved. Recipients of this notice may not be removed from the voter registration lists unless (1) they confirm in writing that they have moved outside the jurisdiction or (2) they do not respond to the notice and do not vote in an election during the two-year period beginning on the date they were mailed notice. *Id.* §§ 1973gg–6(c) & (d). The state cannot mail the notice within the 90–day period prior to the date of a primary or general election for federal office. *Id.* § 1973gg–6(c)(2). (Ex. 1 at 5–7 to 5–10, 5–15 & 5–18 to 5–21.)

18. In 1996, the State of Nebraska used both the NCOA and the mass mailing methods to begin the process of removing from its voter registration lists the names of voters who had moved and were no longer qualified to be registered in a particular precinct. Neb.Rev.Stat.Ann. § 32–329(1) (Lexis 1995). (T. at 55:2–15, 95:14–99:23.) In 1996, approximately 60 to 70 of the 93 counties in Nebraska used the NCOA method and the remaining counties used the mass mailing method. (T. at 101:4–24.) The Federal Election Commission ("FEC") Guide to Implementing the NVRA notes that the NCOA method cannot be used without a computerized voter registry and a list of no less than 100

---

**8.** There is no provision directing the manner in which state convictions are to be reported. In the case of federal convictions, the United States Attorney is required to give the chief election officer of the state written notice of the conviction, and the state's chief election officer is required to notify the relevant local election official of the federal conviction. *Id.* § 1973gg–6(g).

names, and suggests that "States should consider giving local jurisdictions the option of using NCOA when some, but not all local jurisdictions, have computerized registries." (Ex. 1 at 5–19.) When the NCOA method is used, it is apparently used uniformly, and when the mass mailing method is used, it is also apparently used uniformly. (T. at 60:1–8.)

19. In 1996, Nebraska used two methods for removing the names of convicted felons from voter registration lists, depending upon whether the conviction occurred in a federal court or a state court. In the case of state convictions, the clerk of the district court is required to notify the county clerk or election commissioner (in the county of residence of the convicted person) of the conviction so that the name can be purged. (T. at 93:11–18.) In the case of federal convictions, the United States Attorney for the District of Nebraska notifies the Secretary of State of Nebraska of any federal convictions, and the Secretary of State's office in turn notifies county election officials. (*Id.* at 93:18–21.) *See also* Neb.Rev.Stat.Ann. § 32–313 (Lexis 1995).

20. In 1996, no one method was used for removing the names of deceased persons from Nebraska's voter registration records. Nebraska statutes provide that "the election commissioner or county clerk may at any time" remove from the list of registered voters the name "of a deceased person when the election commissioner or county clerk has any supporting information on the death of such voter." Neb.Rev.Stat.Ann. § 32–327 (Lexis 1995). They also require that the Bureau of Vital Statistics must every three months provide, for a fee, a record of deaths to the appropriate election commissioner or county clerk. *Id.* Testimony indicated that "[g]eneral practice has been to use information from obituaries, mortuaries, and vital statistics" to remove the names of deceased voters from voter registration lists. (T. at 95:11–13.)

21. In 1996, the Nebraska Secretary of State's office did not direct all of Nebraska's county election officials to undertake a purge of ineligible voters or voter registration list maintenance procedures on any specific dates. (*Id.* at 116:17–117:14.) Purges and list maintenance procedures were done on a rolling basis, at the discretion of each individual county election official. (*Id.*) However, every six months county election officials were required to file with the Secretary of State a report of the activity regarding voter registration, to assist the office of the Secretary of State in completing the reports required by the FEC under the NVRA. (*Id.* at 117:19–24.) The first such report was due on July 1, 1995. The majority of the counties sent the report "within a couple of week[s]." (*Id.* at 118:10.) Ultimately, all counties sent the required report, though some required repeated requests. (*Id.* at 117:23–119:3.) Though these counties were delinquent in reporting, there was no indication that these counties failed to engage in the required list maintenance procedures. (*Id.* at 130:14–131:3.) Nebraska statutes and the NVRA require that a list maintenance procedure be conducted at least every two years. (*Id.* at 106:11–107:13.)

22. Under Nebraska's methods of maintaining and purging its voter registration lists in 1996, although it would not have been lawful, it was nonetheless possible for a person to be shown as a registered voter in more than one county at the same time, thereby skewing the State's total registered voter count. There was testimony from the Assistant Secretary of State for elections that this did occur an unknown number of times in 1996. (*Id.* at 121:20–123:2 & 132:9–15.)[9]

---

9. Implementation of a statewide computer system allowed the office of the Secretary of State to check to see how many potential duplicates there were in January 1999 (approximately two and one-half years after the relevant date), and there were 7,500 possible duplicates. Not all of these possible duplicates were "double registered" voters—for instance, one represented a McCook man and a Lincoln man with the same first name, last

23. In 1995 and 1996, Nebraska did not budget or maintain a statewide networked computer system to allow for verification of voter registration list maintenance on a periodic basis. The state has since budgeted and funded a computerized system for maintaining voter registration records, which is installed and now operating. The state had not, however, budgeted and funded such a system in 1995 and 1996. (*Id.* at 124:15–126:3.)

24. The NVRA prohibits conducting some of the voter registration list maintenance procedures in the 90 days immediately preceding a federal election,[10] and the office of the Secretary of State has instructed local election officials that they may not conduct list maintenance procedures immediately preceding a federal election. To the best of the knowledge of the Assistant Secretary of State for elections, county election officials followed these instructions in 1996 and thereafter. (*Id.* at 104:1– 106:10.)

25. On July 5, 1996, five initiative petition proposals were submitted to the Secretary of State for approval, including the Property Tax Relief Petition and the Keno Petition. (Ex. 130 at 8:12–22.) County election officials had to review over 660,000 signatures when reviewing these five initiative measures. (Ex. 130 at 47:24–25.)

26. The State of Nebraska has not been the subject of any inquiry by the Federal Election Commission with respect to compliance with the National Voter Registration Act. (T. at 135:16–22.)

## C. Federal Constitutional Claims Regarding Petition Signature Requirements of Article III, Section 2 of the Nebraska Constitution

27. In 1988, the people of Nebraska passed by majority vote an amendment to Article III, Section 2 of the Nebraska Constitution dealing with the initiative in Ne-braska. (Filing 109, ¶ B(8).) Prior to this amendment, the number of signatures needed to place an initiative on the ballot in Nebraska was based on the number of votes in the last gubernatorial election. The 1988 amendments changed the terminology in Article III, Sections 2 and 3 from "electors" to "registered voters" when referring to the eligibility of an initiative and referendum petition signatory. They did not amend Article III, Section 4—which created an inconsistency and a question as to how many signatures were needed to put an initiative petition on the ballot. *Dobrovolny I*, 936 F.Supp. at 1540. The inconsistency in terminology was resolved in *Duggan v. Beermann*, 245 Neb. 907, 515 N.W.2d 788 (1994), when the Nebraska Supreme Court held that the number of signatures required by the Nebraska Constitution for placement of an initiative measure on the general election ballot is equal to ten percent of the number of registered voters in Nebraska measured on the date the signatures are turned in to the Secretary of State for certification. Article III, Section 2, as amended in 1988 and interpreted in *Duggan*, now requires more signatures to place an initiative petition on the ballot than it did prior to its amendment.

## D. Claims Regarding Constitutionality of Neb.Rev.Stat. § 32–1409

28. At the relevant times in 1996, subpart (1) of § 32–1409 provided as follows:

Upon the receipt of the petitions, the Secretary of State, with the aid and assistance of the election commissioner or county clerk, shall determine the validity and sufficiency of signatures on the pages of the filed petition. The Secretary of State shall deliver the various pages of the filed petition to the election commissioner or county clerk by hand carrier, by use of law enforcement

---

name, and birthday. At the time these 7,500 possible duplicates were identified in January 1999, there were over a million registered voters in Nebraska. (*Id.* at 132:17–133:9).

**10.** See Finding of Fact ¶ 17.

officials, or by certified mail, return receipt requested. Upon receipt of the pages of the petition, the election commissioner or county clerk shall issue to the Secretary of State a written receipt that the pages of the petition are in the custody of the election commissioner or county clerk. The election commissioner or county clerk shall compare the signature of each person signing and the circulator upon each of the pages of the petition with the voter registration records to determine if the circulator was a registered voter one month prior to the date of circulating and signing the petition and to determine if each signer was a registered voter on or before the date on which the petition was required to be filed with the Secretary of State. The election commissioner or county clerk shall also compare the signer's printed name, street and number or voting precinct, and city, village, or post office address with the voter registration records to determine whether the signer was a registered voter. The signature and address shall be presumed to be valid only if the election commissioner or county clerk finds the printed name, street and number or voting precinct, and city, village, or post office address to match the registration records and that the registration was received on or before the date on which the petition was required to be filed with the Secretary of State. The finding of the election commissioner or county clerk may be rebutted by any credible evidence which the Secretary of State finds sufficient. The express purpose of the comparison of names and addresses with the voter registration records, in addition to helping to determine the validity of such petition, the sufficiency of such petition, and the qualifications of the signer, shall be to prevent fraud, deception, and misrepresentation in the petition process.

Neb.Rev.Stat.Ann. § 32–1409(1) (Lexis 1995).

29. At the relevant times in 1996, subpart (3) of § 32–1409 provided as follows:

Upon receipt of the pages of the petition, the Secretary of State shall issue a written receipt indicating the number of pages of the petition that are in his or her custody. When all the petitions and certifications have been received by the Secretary of State, he or she shall strike from the pages of the petition all but the earliest dated signature of any duplicate signatures and such stricken signatures shall not be added to the total number of valid signatures. Not more than twenty signatures on one sheet shall be counted. All signatures secured in a manner contrary to sections 32–1401 to 32–1416 shall not be counted. Clerical and technical errors in a petition shall be disregarded if the forms prescribed in sections 32–1401 to 32–1403 are substantially followed. The Secretary of State shall total the valid signatures and determine if constitutional and statutory requirements have been met. The Secretary of State shall immediately serve a copy of such determination by certified or registered mail upon the person filing the initiative or referendum petition. If the petition is found to be valid and sufficient, the Secretary of State shall proceed to place the measure on the general election ballot.

*Id.* § 32–1409(3) (Lexis 1995).

30. After the Nebraska Supreme Court's April 1998 decision in *State ex rel. Dobrovolny v. Moore,* the Attorney General of the State of Nebraska brought an action in state court for a declaratory judgment that § 32–1409(1) violated the state constitution because it removed the presumption of validity of signatures and did not act to facilitate the operation of the initiative process. In December 1999, (after the bench trial and post-trial submissions by the parties in the case before me) the Nebraska Supreme Court ruled that § 32–1409(1) violates the state constitution and enjoined the Secretary of State from

implementing § 32–1409(1).[11] *State ex rel. Stenberg v. Moore*, 258 Neb. 199, 602 N.W.2d 465 (1999). Section 32–1409(1) has not been amended by the Nebraska Legislature since the decision in *State ex rel. Stenberg v. Moore.*[12]

### E. Preclusion of Federal Constitutional Claims Regarding Petition Signature Requirements of Article III, Section 2 of the Nebraska Constitution

31. *Dobrovolny I* was a suit brought by Nebraska residents who were supporters and organizers of various initiative petition drives. The plaintiffs were Kent Bernbeck, co-chair of the Nebraska Term Limits Committee, an organization devoted to circulation of an initiative petition and passage of a constitutional amendment that would limit the terms of elected officials (the "Term Limits Petition"); Stan Dobrovolny, president of Nebraskans for Equal Taxation, an organization devoted to circulation of the Property Tax Relief Petition and ultimate passage of a constitutional amendment regarding property taxes; and Richard Bellino, a sponsor of the Initiative to Preserve Nebraska Assets and Live Horse Racing which proposed the Keno Initiative and passage of an amendment to the Nebraska Constitution which would legalize gambling. (The Property Tax Relief Petition and Keno Petition involved in *Dobrovolny I* are the same petitions involved in the case now before me.) Scott Moore was the defendant, both in his official capacity as Secretary of State of the State of Nebraska and individually. All three initiatives were presented to the office of the Nebraska Secretary of State in an attempt to place those initiative proposals on the November 1996 general election ballot in Nebraska.

32. The issue in *Dobrovolny I* was "whether determining the number of signatures required to place an initiative measure on the general election ballot on the date the signatures are due based on the number of registered voters on that date violates the petitioners' First Amendment or Due Process rights under the United States Constitution." *Dobrovolny I*, 936 F.Supp. at 1537. *Dobrovolny I* held that this method of determining the number of signatures needed to place an initiative petition on the ballot did not violate the First Amendment or the Due Process Clause. The Court of Appeals affirmed. *Dobrovolny v. Moore*, 126 F.3d 1111 (8th Cir.1997), *cert. denied*, 523 U.S. 1005, 118 S.Ct. 1188, 140 L.Ed.2d 319 (1998).

### F. Claims Regarding Specific Denial of Access to Records

33. Douglas County began verification of signatures on the five initiative petitions on July 22, 1996, and completed the process on September 4, 1996. During this time, there were twelve computer terminals in the Douglas County Election Commissioner's office, and two to four terminals were always available to members of the public who wanted to review petitions and petition signatures (subject to access rights of other members of the public). (Ex. 133 at 24:5–25:13.) After September 4, 1996, there were always four computer terminals available to the public for verification of petition signatures. (Ex. 133 at 25:17–22.)

34. From July 22 to September 4, 1996, the ability to view actual voter registration cards in Douglas County was restricted to employees of the Douglas County Election Commissioner's office because those employees were verifying petition signatures.[13] However, during this time, mem-

---

11. The parties have not briefed the effect of this decision on the case before me, though plaintiffs submitted a copy of the decision to me for consideration.

12. A bill to amend § 32–1409, 1999 L.B. 433, was introduced in the first session of the 96th Legislature. It was not adopted and was car-

ried over to the second session of the 96th Legislature, and no action was taken on it during that second session.

13. In September 1996, filed registration cards in the Douglas County Election Commissioner's office occupied approximately 65 to 70 four-drawer file cabinets. There were also

bers of the public could purchase certified copies of those voter registration cards for three dollars, or simple photocopies of those cards for fifteen cents. (Ex. 133 at 79:1–80:14.) After September 4, 1995, members of the public could view voter registration cards by asking a member of the election commissioner's staff to see the card. (Ex. 131 at 60:6–61:16.) The voter registration card is the only document in the Douglas County Election Commissioner's office which bears the registered voter's signature. In addition to voter registration cards, the Douglas County Election Commissioner maintains a voter file (containing name, address, date of birth, voter history, and party affiliation), and information on mainframe computer terminals (which includes all information in the voter file as well as information concerning absentee voting and petitions). (Ex. 133 at 74:4–75:14.) The information stored in the mainframe computer can be accessed in several ways: by sitting at a terminal in the election commissioner's office to view the information; by purchasing a magnetic tape, which can be sorted to provide various data; by purchasing floppy disks, containing the entire Douglas County voter file by ward; or online (after payment of a fee). (Ex. 133 at 75:19–76:15 & 77:8–15.) Computer disks purchased from Douglas County were not accessible without technical computer assistance. (Ex. 132 at 32:18–33:25.)

35. Carol Prokop, office manager for the Douglas County Election Commissioner, met Jane Shen, a woman working on the Property Tax Relief Petition's signature rehabilitation project, twice on October 3, 1996. (Ex. 131 at 61:17–63:19.) The first time, Ms. Shen asked to see four voter registration cards. Ms. Prokop showed Ms. Shen two of the requested cards and was unable to show her the two other requested cards because the individuals named were not registered voters in

approximately 8,000 voter registration cards stacked up waiting to be filed. (Ex. 131 at

Douglas County. (Ex. 131 at 61:17–62:30.) On the second meeting, Ms. Shen asked to see voter registration cards for the persons who had signed a one-inch stack of petitions. (Ex. 131 at 62:21–63:19.) Ms. Prokop told Ms. Shen to make a list of names from the petitions and someone from the office would pull the cards for her so that she could view them. (Ex. 131 at 62:21–63:19.) Ms. Shen did not complain about that process, and she left and was not seen again in the Douglas County Election Commissioner's office. (*Id.*)

36. The Assistant Secretary of State for elections was not aware of any widespread or significant denial of access to election records by county or state election officials in 1996, but rather of minor, isolated instances in which county and state election officials were trying to fairly regulate access to public records in the context of the attempt to put five different initiative petitions, collectively containing over 660,000 signatures, on the November 1996 general election ballot. (Ex. 131 at 21:12–28:3; Ex. 130 at 47:24–25.)

37. There was testimony that in 1996 the information needed by petition supporters regarding petition signatures was more quickly and easily obtained in Sarpy County than it was in Douglas County, as Sarpy County in no way limited access to its voter registration cards, had scanned its voter registration cards into the computer and had a more accessible, more informative computer database than did Douglas County. (Ex. 128 at 8–11, 23.)

38. There was evidence that the invalidity rate in Douglas and Lancaster Counties (42 percent and 40 percent invalid, respectively) was higher than other counties. (Ex. 132 at 32:9–17).

39. One of plaintiffs' witnesses testified that election officials in Scottsbluff County would not permit her to use the computers or to access the paper files without a

60:19–61:7.)

clerk's office employee present, that few of the employees available to assist were computer-proficient, and that on a few occasions the employees in the clerk's office would cease assisting the witness and instead attend to ministerial matters that were not time-sensitive and were unrelated to the signature verification or election process. This witness stated that it took five working days to accomplish what she could have accomplished in two and one-half days, absent the restrictions imposed by Scottsbluff County election officials. (Ex. 132 at 176–188 (Test. of Edwards).) Another witness testified that it took repeated calls and a wait of over a week to obtain a voter registration list from Scottsbluff County. (*Id.* at 211:7–212:21 (Test. of Haight).) When initiative petition supporters initially appeared in their office to attempt to rehabilitate signatures, the staff in the Scottsbluff County clerk's office was uncertain about which records could be released to the public. This was the reason for the one-week wait. (Ex. 109 at 164:17–165:6.)

40. Petitions were in the custody of the Secretary of State in August and September 1996. The Secretary of State made a decision not to assign office personnel to oversee members of the public reviewing the petitions, as that would have severely limited access to the petitions, and as a consequence some petitions were misfiled. There were so many boxes of petitions that for a time they were placed in an unsecured hallway. (Ex. 130 at 50–51.) Some petitions from Nance County were never received by the Secretary of State. (Ex. 130 at 46:12–47:12.) Because of a fraud investigation, the Nebraska State Patrol took possibly hundreds of the petitions, and these petitions were unavailable for rehabilitation. (Ex. 130 at 47:13–25.)

41. The protocol that county election officials should follow when considering the validity of petition signatures that were not an exact match to the voter registration cards was poorly communicated. (Ex. 130 at 43–45.) Defendant Jurgensen mis-

understood the instructions from the Secretary of State's office, causing her to certify some signatures as valid when they were in fact invalid. (Ex. 133 at 15–18; 46–48.) Counties used different notation systems to record the reasons why they had invalidated particular petition signatures. (Ex. 109 at 160:7–10.)

## III. CONCLUSIONS OF LAW

Before I turn in detail to the conclusions of law regarding the issues before me, I will preview the legal issues and my conclusions as to those issues.

The first issue is whether plaintiffs may bring a private cause of action under the NVRA predicated on state ballot questions. I find that plaintiffs cannot bring a private cause of action under the NVRA and accordingly do not decide whether defendants violated the NVRA.

The second issue is whether an earlier case, *Dobrovolny v. Moore,* 936 F.Supp. 1536 (D.Neb.1996) (hereinafter *Dobrovolny I* ), *aff'd,* 126 F.3d 1111 (8th Cir.1997), *cert. denied,* 523 U.S. 1005, 118 S.Ct. 1188, 140 L.Ed.2d 319 (1998), operates as a res judicata bar to plaintiffs' claims that the petition signature requirements of the Nebraska Constitution violate the First Amendment and the Due Process Clause of the Fourteenth Amendment. I conclude that *Dobrovolny I* operates as a res judicata bar and do not reach the merits of plaintiffs' federal constitutional claims regarding the petition signature requirements.

The third issue is whether § 32–1409 violates the First Amendment, both on its face and as applied. I conclude that I should not decide this question because the claim has been in effect mooted by the Nebraska Supreme Court's decision holding that this statute violated the Nebraska Constitution.

The final issue is whether plaintiffs are entitled to declaratory and injunctive relief regarding their claims that denial of access to initiative petition and voter registration

records violated their First Amendment rights. I find that I lack jurisdiction to decide this claim as it no longer presents a live case or controversy.

### A. NVRA Claims

Plaintiffs assert that defendants have violated two NVRA voter registration list maintenance requirements and that they may bring a private right of action pursuant to 42 U.S.C. § 1973gg–9(b) to remedy these alleged violations. I will briefly outline the alleged violations before addressing the question whether plaintiffs may bring a NVRA private right of action.

The NVRA provides that each state must conduct a uniform and nondiscriminatory general program to remove the names of ineligible voters from the official voter registration rolls by reason of the death or change of address of the registrant. 42 U.S.C. §§ 1973gg–6(a)(4) & 1973gg–6(b)(1). Plaintiffs assert that Nebraska's program of removing ineligible voters is not "uniform and nondiscriminatory" as required by § 1973gg–6(b)(1) in several respects. First, all counties in Nebraska do not use the same methods for removals by reason of death or change of address. Second, different procedures are used for removals due to conviction of federal felonies than for removals due to conviction of state felonies. Third, all counties do not conduct their voter registration list maintenance procedures at the same times.

One of the listed purposes of the NVRA is "to ensure that accurate and current voter registration rolls are maintained," 42 U.S.C. § 1973gg(b) (1994), and plaintiffs assert that this statement of purpose creates a requirement that voter registration rolls be *"accurate"* and *"current."* Plaintiffs assert that Nebraska's rolls were not *"accurate"* in 1996 for two reasons. First, although it was not legal, it was possible for the same person to be simultaneously registered to vote in more than one county. Second, although it is unclear, plaintiffs appear to argue that the rolls were not "accurate" because the names of regis-

tered voters who died or were convicted of a felony were not removed immediately upon the occurrence of the disqualifying event, or pursuant to a fixed schedule. Plaintiffs also assert that Nebraska's voter registration rolls were not *"current"* in 1996 because on the date that the initiative petitions were due, the Secretary of State did not know the number of registered voters in Nebraska (although that number was capable of later calculation).

### Does the NVRA Provide a Private Right of Action for an Alleged Violation of the NVRA Predicated on State Ballot Questions?

The key question under the NVRA is whether the NVRA provides a private right of action for an alleged violation of the NVRA predicated on *state ballot questions.* This question is one of statutory construction. Analysis is limited to determining congressional intent and begins with the language of the statute. *Touche Ross & Co. v. Redington,* 442 U.S. 560, 568, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979) (holding that there is no implied private cause of action for damages under § 17(a) of the Securities Exchange Act of 1934). Resolving the statutory construction question also includes analysis of the statutory scheme of which the language allegedly creating the private right of action is a part. *Id.* at 571, 99 S.Ct. 2479. Nevertheless, "[t]he central inquiry remains whether Congress intended to create, either expressly or by implication, a private cause of action." *Id.* at 575, 99 S.Ct. 2479. The Supreme Court has been "extremely reluctant to imply a cause of action ... that is significantly broader than the remedy that Congress chose to provide." *Id.* at 574, 99 S.Ct. 2479.

The question whether the NVRA provides a private right of action for an alleged violation of the NVRA predicated on state ballot questions is a question of first impression. The majority of the reported cases construing the NVRA are suits against states that would not comply with

the expanded voter registration requirements of the NVRA, and were usually defended on the ground that Congress lacked authority to force the states to participate in federal voter registration on the scale contemplated by the NVRA. *See, e.g., Disabled in Action v. Hammons,* 202 F.3d 110 (2d Cir.2000) (New York); *Association of Community Organizations for Reform Now (ACORN) v. Fowler,* 178 F.3d 350 (5th Cir.1999) (Louisiana); *National Coalition for Students with Disabilities Educ. & Legal Defense Fund v. Allen,* 152 F.3d 283 (4th Cir.1998) (Virginia); *Association of Community Organizations for Reform Now (ACORN) v. Miller,* 129 F.3d 833 (6th Cir.1997) (Michigan); *Voting Rights Coalition v. Wilson,* 60 F.3d 1411 (9th Cir.1995) (California), *cert. denied,* 516 U.S. 1093, 116 S.Ct. 815, 133 L.Ed.2d 759 (1996); *Association of Community Organizations for Reform Now (ACORN) v. Edgar,* 56 F.3d 791 (7th Cir.1995) (Illinois). A few of the reported cases relate to the interplay between the preclearance provisions of the Voting Rights Act and the NVRA. *See, e.g., Lopez v. Monterey County,* 525 U.S. 266, 119 S.Ct. 693, 142 L.Ed.2d 728 (1999); *Young v. Fordice,* 520 U.S. 273, 117 S.Ct. 1228, 137 L.Ed.2d 448 (1997).

In analyzing whether plaintiffs can assert a private right of action under the NVRA, I will consider whether Congress has the authority to create a private right of action predicated on state ballot questions, whether Congress intended to create such a right of action, and principles of federalism. I first consider the authority under which Congress enacted the NVRA.

### Congressional Authority

 The NVRA was enacted under Congress' constitutional authority to regulate federal elections. Article I, Section IV, Clause 1 of the Constitution provides that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." This provision gives Congress a general supervisory power over federal elections under which it may supplement state regulations or substitute its own. *Smiley v. Holm,* 285 U.S. 355, 366–67, 52 S.Ct. 397, 76 L.Ed. 795 (1932); *ACORN v. Edgar,* 56 F.3d at 795. However, Article I, Section IV does not give Congress the power to directly regulate state voter registration procedures in state elections or state ballot issues. *ACORN v. Edgar,* 56 F.3d at 794. Therefore, I conclude that Congress' authority to regulate federal elections under Article I, Section IV of the Constitution does not permit Congress to create a private right of action under the NVRA predicated on state ballot questions.

### Congressional Intent—Words and Structure of NVRA

I will next analyze whether Congress intended to create a private right of action for an alleged violation of the NVRA predicated on *state ballot questions* by considering the factors traditionally used to determine legislative intent: "the language and focus of the statute, its legislative history, and its purpose." *Touche Ross,* 442 U.S. at 575–76, 99 S.Ct. 2479. I analyze congressional intent because it determines the scope of a private right of action. *See, e.g., Wisdom v. First Midwest Bank,* 167 F.3d 402, 407–08 (8th Cir.1999). This is so whether the question is the scope of an explicitly created private right of action, or if the question is whether Congress intended to create an implied right of action. *See, e.g., Consolidated Rail Corp. v. Darrone,* 465 U.S. 624, 104 S.Ct. 1248, 79 L.Ed.2d 568 (1984); *Touche Ross,* 442 U.S. at 568, 575–76, 99 S.Ct. 2479.

The language and focus of the NVRA indicate that Congress did not intend to create such a private right of action. Generally, the NVRA

requires States to provide simplified systems for registering to vote in *federal*

elections, i.e., elections for federal officials, such as the President, congressional Representatives, and United States Senators. The States must provide a system for voter registration by mail, § 1973gg–4, a system for voter registration at various state offices (including those that provide "public assistance" and those that provide services to people with disabilities), § 1973gg–5, and, particularly important, a system for voter registration on a driver's license application, § 1973gg–3. The NVRA specifies various details about how these systems must work.... It also imposes requirements about just when, and how, States may remove people from the federal voter [registration] rolls. §§ 1973gg–6(a)(3), (4).

*Young v. Fordice,* 520 U.S. 273, 275–76, 117 S.Ct. 1228, 137 L.Ed.2d 448 (1997) (emphasis in original) (examining interplay between NVRA and the Voting Rights Act of 1965, and finding that plan by Mississippi to comply with NVRA for federal elections, yet retain separate system for state elections, required preclearance under Voting Rights Act).

The provisions of the NVRA are expressly limited to federal elections. The congressional findings state that

(1) the right of citizens of the United States to vote is a fundamental right;

(2) it is the duty of the Federal, State, and local governments to promote the exercise of that right; and

(3) discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation *in elections for Federal office* and disproportionately harm voter participation by various groups, including racial minorities.

42 U.S.C. § 1973gg(a) (emphasis added). The purposes of the NVRA are also clearly tied to increasing voter participation in federal elections. The act provides that

The purposes of this subchapter are—

(1) to establish procedures that will increase the number of eligible citizens who register to vote *in elections for Federal office;*

(2) to make it possible for Federal, State, and local governments to implement this subchapter in a manner that enhances the participation of eligible citizens as voters *in elections for Federal office;*

(3) to protect the integrity of the electoral process; and

(4) to ensure that accurate and current voter registration rolls are maintained.

*Id.* § 1973gg(b) (emphasis added).

Plaintiffs argue that the fact that the broad language of 42 U.S.C. §§ 1973gg(a)(2) and 1973gg(b)(3) and (4) is not expressly limited by reference to federal elections somehow bolsters their claim. This argument is without merit, as the cited language is limited by the scope of the power granted to Congress by Article I, Section IV of the Constitution.

The provision of the NVRA creating certain private rights of action states as follows:

(1) A person who is aggrieved by a violation of this subchapter [the NVRA] may provide written notice of the violation to the chief election official of the State involved.

(2) If the violation is not corrected within 90 days after receipt of a notice under paragraph (1), or within 20 days after receipt of the notice if the violation occurred within 120 days before the date of an election for Federal office, the aggrieved person may bring a civil action in an appropriate district court for declaratory or injunctive relief with respect to the violation.

(3) If the violation occurred within 30 days before the date of an election for Federal office, the aggrieved person need not provide notice to the chief election official of the State under para-

graph (1) before bringing a civil action under paragraph (2).

42 U.S.C. § 1973gg–9(b). If a civil enforcement action is brought, the prevailing party (other than the United States) may be awarded "reasonable attorney fees, including litigation expenses, and costs." *Id.* § 1973gg–9(c).

In fact, all of the provisions of the NVRA are directed to what states must do with respect to elections for federal office. *Young,* 520 U.S. at 275–76, 117 S.Ct. 1228. Therefore, I find that the words and structure of the NVRA indicate that a private right of action to enforce the voter registration list maintenance provisions of the NVRA is limited to challenges by voters harmed by violations of the NVRA in the context of elections for federal offices.

### Congressional Intent—Legislative History

The legislative history of the NVRA suggests that Congress intended that the NVRA private right of action exist only in the context of denial of access to voting for federal elective office. The legislative history indicates that the NVRA was intended to increase voter participation in federal elections by eliminating barriers to voting.

The House Report on the NVRA indicates that Congress wanted to make it easier to register to vote so that voter participation in federal elections would increase. H.R.Rep. No. 103–9, at 3 (1993) (found in Ex. 1, App. B at B–2) ("while Congress may not be able to directly affect voter turnout in Federal elections through the enactment of legislation, Congress does have the authority and responsibility to make the registration process for Federal elections as accessible as possible while maintaining the integrity of the electoral process. . . ."). The voter registration list maintenance provisions of the NVRA are intended to eliminate the possibility that list maintenance could be used as a barrier to deprive members of disadvantaged groups from exercising their right to vote for federal office. The House Report states that the committee was con-

cerned that voter registration list purging programs "can be abused and may result in the elimination of names of voters from the rolls solely due to their failure to respond to a mailing." *Id.* at 15 (found in Ex. 1, App. B at B–8). The Senate Report also expresses concern that voter registration list maintenance procedures could be misused in a manner that disproportionately impacts minorities. S.Rep. No. 103–6, at 17–20 (1993) (found in Ex. 1, App. C at C–9 to C–10) ("While most States use the procedure of removal for non-voting merely as an inexpensive method for eliminating persons believed to have moved or died, many persons may be removed from the election rolls merely for exercising their right not to vote, a practice which some believe tends to disproportionately affect persons of low incomes, and blacks and other minorities. . . . In response to the concerns of various witnesses representing civil rights organizations, these [voter registration list maintenance procedure] requirements of the bill were added to prevent the discriminatory nature of periodic voter purges, which they assert appear to affect blacks and minorities more than others.").

Congress was aware that the NVRA was enacted under its Article I, Section IV constitutional authority to regulate federal elections. S.Rep. No. 103–6, at 3 (found in Ex. 1, App. C at C–2). It is unlikely that Congress would have intended that the NVRA private right of action include claims based on state ballot questions, as the authority under which Congress enacted the NVRA does not permit it to directly regulate state ballot issues or elections.

### Congressional Intent— Purpose of NVRA

 It would be inconsistent with the purpose of the NVRA for Congress to create a private cause of action for persons who assert claims tied to state ballot issues. The NVRA was enacted primarily to increase the number of citizens eligible to vote in elections for federal office. 42

U.S.C. § 1973gg(b)(1). The private right of action is for persons "aggrieved" by a violation of the NVRA. *Id.* § 1973gg–9(b)(1). Persons "aggrieved" by a violation of the NVRA are persons who allege that their right to vote in an election for federal office have been impaired by a violation of the NVRA. *Krislov v. Rednour,* 946 F.Supp. 563, 566 (N.D.Ill.1996) (unsuccessful candidates for federal office who alleged that signatures on nominating petitions were invalidated on grounds contrary to NVRA were not "aggrieved persons" and did not have jurisprudential standing because candidates did not allege they were deprived of right to vote for federal elective office, but instead complained about losing their right to be placed on the ballot).

Implicit in *Krislov* is the conclusion that signing a petition is one step removed from voting, and that only persons who allege that their rights to vote in an election for federal office have been impaired can bring a private action under the NVRA. Plaintiffs in the case before me are in the same position as the circulators of nominating petitions in *Krislov.* Their argument that the initiative petitions they supported would have been on the 1996 general election ballot absent alleged violations of NVRA voter registration list maintenance procedures is not an argument that their rights to vote in an election were impaired. *Signing* an initiative petition is not *voting,* and does not relate to an election for *federal office.*

Plaintiffs argue that it is immaterial that their NVRA claims do not arise in the context of their attempt to vote in an election for federal office, since Nebraska does not maintain a dual system of voter registration for state and federal elections. This argument is without merit and ignores the fact that plaintiffs must be persons "aggrieved" by a violation of the NVRA. *Id; cf. ACORN v. Miller,* 129 F.3d at 837 (although the NVRA registration obligations "will likely affect registration procedures associated with state and local elections, this result will arise as a matter of convenience and not because the [NVRA] requires it.").

### Congressional Intent—Summary

In summary, analysis of the factors traditionally used to determine legislative intent leads to the conclusion that Congress did not intend to create a private right of action under the NVRA predicated on state ballot questions. I now move on to consider how principles of federalism affect analysis of congressional intent.

### Principles of Federalism

Lastly, I consider whether principles of federalism would be violated if I were to conclude that plaintiffs can bring a private cause of action under the NVRA predicated on state ballot questions. "A concern for federalism cautions against the excessive entanglement of federal courts in state election contests." *Roberts v. Wamser,* 883 F.2d 617, 622–23 (8th Cir.1989). This court would be excessively entangled in the state initiative petition process if I found that plaintiffs could bring a private cause of action under the NVRA.

■ Plaintiffs' claims are predicated on their inability to get their initiatives on the state ballot. The right to the initiative petition is created by state law, not federal law. *Dobrovolny I,* 936 F.Supp. at 1541. As the NVRA was enacted under Congress' authority to regulate federal elections under Article I, Section IV of the Constitution, and as plaintiffs' challenge to the NVRA voter registration list maintenance procedures arises in the context of state ballot questions, principles of federalism would be violated if I were to conclude that plaintiffs can bring a private cause of action under the NVRA predicated on a state ballot question.

### Alternative Conclusion of Law: No Standing as "Aggrieved Persons"

■ Though I believe that the question before me is not simply a question of standing, the preceding analysis is very

similar to the analysis used to determine whether a particular plaintiff meets prudential standing requirements. *See, Roberts v. Wamser*, 883 F.2d 617; *Krislov v. Rednour*, 946 F.Supp. 563. As an alternative to my conclusion that a private cause of action cannot be brought under the NVRA in connection with a state ballot issue, I find that plaintiffs do not have standing as "aggrieved persons" under the NVRA because they do not allege that their rights to vote in a federal election have been denied or impaired. The same analysis which supports my conclusion that the NVRA does not provide a private right of action for an alleged violation of the NVRA predicated on state ballot questions supports the conclusion that plaintiffs do not have standing under the NVRA.

## B. Preclusion of Federal Constitutional Claims Regarding Petition Signature Requirements of Article III, Section 2 of the Nebraska Constitution

Plaintiffs have brought Due Process Clause and First Amendment claims regarding the petition signature requirements of Article III, Section 2 of the Nebraska Constitution. First, plaintiffs assert that lack of knowledge of the number of signatures needed to place an initiative petition on the ballot prior to the date the signatures are due violates their rights to procedural due process. Second, plaintiffs assert that this same lack of prior knowledge violates the First Amendment. Third, plaintiffs claim that the requirement that only registered voters may sign initiative petitions violates the First Amendment rights of Nebraska citizens who have chosen not to register to vote, yet wish to assist in placing initiatives to amend the state constitution on the ballot.

### Res Judicata—Generally

Defendants assert that the doctrine of res judicata applies and bars plaintiffs from bringing these claims. Analysis of defendants' res judicata defense begins with a general explanation of res judicata and preclusion.

▉ Though "res judicata" in the generic sense refers to both claim preclusion and issue preclusion, the term "res judicata" now often refers only to "claim preclusion" and the term "collateral estoppel" is typically used only to refer to "issue preclusion." *Lane v. Peterson*, 899 F.2d 737, 741 n. 3 (8th Cir.), *cert. denied*, 498 U.S. 823, 111 S.Ct. 74, 112 L.Ed.2d 48 (1990). Res judicata (claim preclusion) "precludes the relitigation of a claim on grounds that were raised or could have been raised in the prior action." *Id.* at 741. It is clear that

[t]he doctrine of res judicata bars claims where one suit follows another if the following elements are met: (1) a prior judgment was rendered by a court of competent jurisdiction; (2) the prior decision was a final judgment on the merits; (3) the same cause of action is involved in all cases; and (4) the same parties or those in privity are involved in all cases. *See, e.g., Headley v. Bacon*, 828 F.2d 1272, 1274 (8th Cir.1987) (citing *Montana v. United States*, 440 U.S. 147, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979)); *King v. Hoover Group, Inc.*, 958 F.2d 219, 222 (8th Cir.1992) (applying same test under Nebraska law).

*County of Boyd v. U.S. Ecology, Inc.*, 858 F.Supp. 960, 966 (D.Neb.1994), *aff'd*, 48 F.3d 359 (8th Cir.), *cert. denied*, 516 U.S. 814, 116 S.Ct. 65, 133 L.Ed.2d 27 (1995).

Defendants assert that this court's decision in an earlier case, *Dobrovolny I*, 936 F.Supp. 1536, creates a res judicata bar to plaintiffs' present claims that the petition signature requirements of Article III, Section 2 of the Nebraska Constitution violate the First Amendment and the Due Process Clause. I next analyze the question whether *Dobrovolny I* presents a res judicata bar.

### *Dobrovolny I* as Res Judicata

The first and second elements of res judicata are met: *Dobrovolny I* was a final

decision on the merits rendered by a court of competent jurisdiction. Plaintiffs have acknowledged that "the Plaintiffs herein and those in the cited case [*Dobrovolny I* ] are either the same parties or those in privity therewith," satisfying the fourth element of res judicata. (Pls.' [Post-trial] Reply Br. at 6.) Thus, *Dobrovolny I* will have res judicata effect if the third element of res judicata is met—in other words, if *Dobrovolny I* involves the same cause of action as the case now before me.

■■ What is the test for determining whether the "same cause of action" is involved for res judicata purposes? The Court of Appeals for the Eighth Circuit has adopted the transactional approach of the Restatement (Second) of Judgments, and under this approach "a claim is barred by res judicata if it arises out of the same nucleus of operative facts as the prior claim." *Lane*, 899 F.2d at 742. In determining whether a later claim arises out of the same nucleus of operative facts as a prior claim,

> [t]he present trend is to see claim in factual terms and to make it coterminous with the transaction regardless of the number of substantive theories, or variant forms of relief flowing from these theories, that may be available to the plaintiff; regardless of the number of primary rights that may have been invaded; and regardless of the variations in the evidence needed to support the theories or rights. The transaction is the basis of the litigative unit or entity which may not be split.

*Id.* at 743 (quoting Restatement (Second) of Judgments § 24, cmt. a at 197 (1980)). *Accord, Costner v. URS Consultants, Inc.*, 153 F.3d 667, 673–74 (8th Cir.1998). Though courts have noted that the "same cause of action" element of claim preclusion applies because the same facts are involved in both cases, *see, e.g., County of Boyd*, 48 F.3d at 361, claim preclusion can be applied even if the same facts are not involved in both cases. *Lane*, 899 F.2d at 743.

■ Do *Dobrovolny I* and the case now before me involve the same nucleus of operative facts? Both cases involve the unsuccessful attempt to place the Property Tax Relief Petition and the Keno Petition on Nebraska's November 1996 general election ballot. Both cases challenge the same clause of the Nebraska Constitution—the requirement that "if the petition be for the amendment of the Constitution, the petition therefor shall be signed by ten percent of such registered voters." Neb. Const. art. III, § 2 (Lexis 1995). In both *Dobrovolny I* and the present case, this provision, as interpreted by the Nebraska Supreme Court in *Duggan v. Beermann*, 245 Neb. 907, 515 N.W.2d 788 (1994), was challenged on First Amendment and Due Process grounds because petition circulators lacked prior knowledge of the number of signatures needed to place an initiative petition on the ballot.

The case before me does include one claim that was not made in *Dobrovolny I*: the claim that requiring petition signers to be registered voters violates the First Amendment. However, this claim is based on the same clause of the Nebraska Constitution which was challenged in *Dobrovolny I*, and while this particular theory of relief was not advanced in *Dobrovolny I*, it could have been. *Lane*, 899 F.2d at 741 (claim preclusion precludes relitigation of a claim on grounds that could have been raised in a prior action).

Because both *Dobrovolny I* and the case now before me involve the same nucleus of operative facts and thus the same cause of action for res judicata purposes, I find that *Dobrovolny I* is res judicata as to all of plaintiffs' claims regarding the petition signature requirements in the Nebraska Constitution. However, I must address plaintiffs' arguments that *Dobrovolny I* should not operate as a res judicata bar to their claim that the state constitutional provision requiring petition *signers* to be registered voters violates the First Amendment.

First, plaintiffs assert that since they were under time pressures in *Dobrovolny I* and were focusing on signature gathering rather than signature counting at that time, *Dobrovolny I* should not operate as res judicata. The fact that the parties to an earlier case involving ballot access questions were under time pressures is an insufficient reason to create an exception to the doctrine of res judicata. *Independent Party v. Priest*, 907 F.Supp. 1276, 1280–82 (E.D.Ark.1995). Additionally, Plaintiffs' characterization of the signature gathering and signature counting requirements as such different procedures that res judicata should not apply is incorrect. In challenging the requirement that petition signers be registered voters, plaintiffs are challenging a part of the signature gathering process.

■ Second, plaintiffs assert that an earlier case should not operate as a res judicata bar if that earlier case litigated an issue of great public importance and unusual circumstances favor reexamination of that issue. The only "unusual circumstance" cited by plaintiffs to support imposition of this public interest exception to res judicata consist of comments in Chief Justice Rehnquist's dissenting opinion in a case decided subsequent to *Dobrovolny I, Buckley v. American Constitutional Law Foundation*, 525 U.S. 182, 119 S.Ct. 636, 142 L.Ed.2d 599 (1999) (holding that state statute requiring that initiative petition *circulators* be registered voters and wear identification badge bearing their names violated the First Amendment and that another state statute requiring that proponents of an initiative report names and addresses of all paid circulators, together with the amounts paid to each circulator, violated the First Amendment). However, an earlier case has res judicata effect over a later case, even when a decision subsequent to the earlier case holds that the statute under which the earlier case was decided was unconstitutional. *Independent Party*, 907 F.Supp. at 1282. Moreover, nothing about Chief

Justice Rehnquist's dissent in *Buckley* justifies a reexamination of the barred issues.

For the reasons set forth above, I reject plaintiffs' arguments that *Dobrovolny I* should not operate as a res judicata bar. I now move to the next issue before me.

## C. Claims Regarding Constitutionality of Neb.Rev.Stat. § 32–1409

■ Plaintiffs claim that §§ 32–1409(1) and (3) violate the First Amendment and the Due Process Clause of the Fourteenth Amendment, both on their face and as applied. Subpart (1) of § 32–1409 requires the Secretary of State (with the aid of county election officials) to "determine the validity and sufficiency" of the signatures on filed initiative petitions and requires the county election officials to compare signatures, names and addresses on the petitions with those on the voter registration cards and records. Under § 32–1409(1), county election officials make findings as to the validity of petition signatures and the Secretary of State may "rebut" these findings by "any credible evidence" he or she considers "sufficient." Plaintiffs assert that the absence of time limits for county election officials and the Secretary of State to make the signature validity findings required by § 32–1409(1), coupled with the lack of standards as to what the Secretary of State may consider to be "credible evidence" that could rebut a county election official's finding, violate the First Amendment and the Due Process Clause of the Fourteenth Amendment. Subpart (3) of § 32–1409 refers to the mechanical process by which the Secretary of State totals "valid signatures" and "determine[s] if constitutional and statutory requirements have been met." Plaintiffs seek a declaratory judgment that the statute is unconstitutional, injunctive relief with respect to the November 1996 general election and money damages from the State of Nebraska. They also seek attorneys' fees and costs pursuant to § 1988 (which may be awarded only if they qualify as "prevailing parties" under § 1988). (Dobrovolny Complaint at 23.)

I have previously ruled that the State of Nebraska has Eleventh Amendment immunity on all claims for money damages (except to the extent attorney fees and expenses could be awarded under the NVRA) and that the claims for injunctive relief were denied as moot to the extent they sought injunctive relief with respect to the November 1996 general election. (Filing 111.) Accordingly, if plaintiffs successfully proved that §§ 32–1409(1) and (3) violated the First Amendment or the Due Process Clause, the only relief they could obtain on the merits of their claims is a declaratory judgment that § 32–1409 is unconstitutional.

Federal courts should avoid reaching constitutional claims if the case may be disposed of on alternate grounds. *See, e.g., Lyng v. Northwest Indian Cemetery Protective Ass'n,* 485 U.S. 439, 445–46, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988); *Beeson v. Hudson,* 630 F.2d 622, 627 (8th Cir.1980). Under this principle, a court should not reach a decision on a constitutional claim unless a decision on that question would entitle the parties to relief which they could not otherwise obtain. *Lyng,* 485 U.S. at 446, 108 S.Ct. 1319.

In late 1999, the Nebraska Supreme Court ruled that § 32–1409(1) violates the Nebraska Constitution and enjoined the Secretary of State from implementing § 32–1409(1). *State ex rel. Stenberg v. Moore,* 258 Neb. 199, 602 N.W.2d 465 (1999). Since there is already a declaratory judgment that § 32–1409(1) is unconstitutional and an injunction barring implementation of § 32–1409(1), plaintiffs could obtain no additional relief on the merits of their claim if I were to reach the federal constitutional questions regarding § 32–1409(1).

Accordingly, I do not reach the question whether § 32–1409(1) violates the First Amendment or the Due Process Clause because these issues have in effect become moot. The post-trial briefs and findings of fact and conclusions of law submitted by the parties were submitted prior to *State*

*ex rel. Stenberg v. Moore* and contain arguments as to what weight, if any, I should give an opinion of Lancaster County District Judge Cheuvront regarding § 32–1409(1) which was later nullified by the Nebraska Supreme Court. In light of my decision that I do not reach the issue of the constitutionality of § 32–1409(1), I need not decide the question of what, if any, weight to give Judge Cheuvront's opinion.

My findings thus far apply only to subpart (1) of § 32–1409. However, because the pretrial order lists as an issue the question whether both subparts (1) and (3) of 32–1409 violate the First Amendment or the Due Process Clause, I must decide whether to reach the question of the constitutionality of subpart (3) of § 32–1409. The parties have not briefed subpart (3) of § 32–1409 as an independent ground for relief, so any claims as to subpart (3) have been abandoned for failure to brief. NELR 39.2(c). Further, subpart (3) of § 32–1409 contains reference to the mechanical process by which the Secretary of State totals "valid signatures" and "determine[s] if constitutional and statutory requirements have been met." Subpart (1) of § 32–1409 explains the process by which the Secretary of State determines the validity of petition signatures. Subpart (3) in effect incorporates subpart (1) and is incomprehensible without reference to subpart (1). Because the Nebraska Supreme Court has declared that subpart (1) of § 32–1409 is unconstitutional and has enjoined the Secretary of State from implementing it, and because subpart (3) effectively incorporates the unconstitutional and inoperative subpart (1), I need not reach the question of the constitutionality of subpart (3) of § 32–1409.

**D. Specific Denial of Access to Records**

Plaintiffs claim that they were denied access to initiative petition and voter registration records during the petition signature verification process in violation of the

First Amendment. They seek a declaratory judgment and injunctive relief.

Several significant coincidences surrounding the November, 1996 general election in Nebraska affect plaintiffs' claims of denial of access. The November, 1996 election represented several general election "firsts." It was the first time initiative petitions were submitted after the 1995 amendment of § 32–1409(1) which eliminated the presumption of validity of petition signatures. It was the first time the requirement that ten percent of the registered voters, rather than ten percent of the voters in the last gubernatorial election, sign initiative petitions was operative. Since it was the first time the voter registration and voter registration list maintenance requirements of the NVRA were effective in a federal election in Nebraska, it was also the first time those NVRA requirements were effective in Nebraska at an election at which proponents sought to place initiative petitions on the state ballot.

At most, the evidence establishes the following. County election officials were initially confused about which election records petition circulators were entitled to obtain. There was some misunderstanding by both the Secretary of State and the county election officials concerning the process to be used under § 32–1409 to validate signatures. There were isolated instances of denial of access to petition or voter registration information. County election officials (and petition circulators) were overwhelmed: they had a short time to validate signatures on five separate initiative petitions, collectively containing 666,000 signatures requiring validation. In essence, the same combination of factors which created the time pressures and uncertainty of which plaintiffs complain also adversely affected state and county election officials.

In the absence of a live controversy which can support the entry of injunctive relief or a declaratory judgment, this court has no jurisdiction. *Indepen-dent Voters v. Kusper*, 490 F.2d 1126 (7th Cir.1974) (no live controversy in case where plaintiffs sought injunctive relief to remedy alleged prior First Amendment violations for lack of access to political candidate's nominating petitions once legislation clearly granting access was enacted); *see also Marine Equip. Management Co. v. United States*, 4 F.3d 643, 646 (8th Cir. 1993) ("Because the test to determine the existence of a 'substantial controversy' [that could support the entry of a declaratory judgment] is imprecise, the decision of whether such controversy exists is made upon the facts on a case by case basis.... The controversy must be live throughout the course of the litigation and must exist at the time of the district court's hearing of the matter and not simply when the case is filed."); *Nebraska v. Central Interstate Low–Level Radioactive Waste Comm'n*, 29 F.Supp.2d 1085, 1092 (D.Neb. 1998) (state's assertion that it had right to veto waste import permits under interstate compact did not present an actual controversy as required by the Declaratory Judgment Act, because no waste import permits were pending or threatened), *aff'd*, 207 F.3d 1021, 1026 n. 9 (8th Cir.2000); *cf. Bernbeck v. Moore*, 936 F.Supp. 1543, 1567–68 (D.Neb.1996) (although requirement that petition circulators be registered voters was held to violate First Amendment, claims of the one plaintiff who was not a Nebraska resident were dismissed because there was no actual case or controversy; she did not appear at trial, the record contained little evidence about her, and there was no evidence that she would be actually injured by the restrictions in the future), *aff'd*, 126 F.3d 1114 (8th Cir. 1997).

In light of the unique circumstances surrounding the November 1996 general election in Nebraska, the failure to establish any more than isolated instances of denial of access, and the Nebraska Supreme Court's recent ruling enjoining the implementation of § 32–1409(1) (the statute governing validation of signatures on initiative

petitions), *State ex rel. Stenberg v. Moore,* 258 Neb. 199, 602 N.W.2d 465 (1999), it is unlikely that the past isolated instances of denial of access about which plaintiffs complain will reoccur. Therefore, I find there is no live case or controversy and that this court lacks jurisdiction over plaintiffs' claims of denial of access.

## IV. SUMMARY

I have found the following.

Plaintiffs cannot bring a private cause of action under the NVRA because neither the words nor the structure of the NVRA provide a private right of action for an alleged violation of the NVRA predicated on state ballot questions; Congress does not have the authority to create a NVRA private right of action predicated on state ballot questions; Congress did not intend to create such a private right of action; and principles of federalism would be violated if I were to conclude that plaintiffs can bring a private cause of action under the NVRA predicated on state ballot questions. Alternatively, I have found that plaintiffs do not have standing as aggrieved persons under the NVRA because they do not allege that their rights to vote in a federal election have been denied or impaired.

This court's decision in *Dobrovolny I,* 936 F.Supp. 1536 (D.Neb.1996), presents a res judicata bar to plaintiffs' claims that the petition signature requirements of Article III, Section 2 of the Nebraska Constitution (both the lack of prior knowledge of the number of signatures needed and the requirement that petition signers be registered voters) violate the First Amendment and the Due Process Clause. A res judicata bar is created because *Dobrovolny I* was a decision on the merits rendered by a court of competent jurisdiction, and *Dobrovolny I* and this case involve the same parties, or parties in privity, and arise out of the same nucleus of operative facts.

I do not decide the question whether § 32–1409 violates the First Amendment or the Due Process Clause. Federal courts should not reach constitutional claims unless a decision on those claims would entitle the parties to relief which they could otherwise not obtain. Plaintiffs would not be entitled to any additional relief on the merits of their claims if I were to decide their federal constitutional claims. They seek a declaratory judgment to remedy their claims regarding § 32–1409, and the Nebraska Supreme Court has already ruled in *State ex rel. Stenberg v. Moore,* 258 Neb. 199, 602 N.W.2d 465 (1999), that § 32–1409(1) violates the Nebraska Constitution and has enjoined the Secretary of State from implementing § 32–1409(1). Therefore, the federal constitutional issues have in effect been rendered moot.

This court lacks jurisdiction to hear plaintiffs' claims of denial of access to initiative petition and voter registration records in 1996, because those claims do not now present a live case or controversy. It is unlikely that the past isolated instances of denial of access will reoccur in light of the unique circumstances surrounding the November 1996 general election in Nebraska, the failure to establish any more than isolated instances of denial of access, and the Nebraska Supreme Court's recent ruling in *State ex rel. Stenberg v. Moore* enjoining the implementation of § 32–1409(1).

For the reasons set forth above,

IT IS ORDERED

1. The Clerk of the United States District Court for the District of Nebraska shall file a copy of Judge Cheuvront's decision in *State of Nebraska ex rel. Dobrovolny v. Moore,* Docket 547, Page 043 (Lancaster County District Court Oct. 25, 1996); and

2. Judgment for defendants and against plaintiffs, providing that plaintiffs shall take nothing, shall be entered by separate document.